Terry J. ECKLES, Plaintiff–Appellant,

v.

CONSOLIDATED RAIL CORPORATION, United Transportation Union International, and United Transportation Union Local 1963, Defendants–Appellees.

No. 95–2856.

United States Court of Appeals, Seventh Circuit.

Argued April 5, 1996.

Decided Aug. 14, 1996.

---

T. Russell Strunk (argued), Warsco, Brogan & Strunk, Fort Wayne, IN, Lisa L. Schneider, Kuss & Schneider, Indianapolis, IN, for Terry J. Eckles.

Nicholas C. Nizamoff (argued), Cynthia L. Wodock, White & Raub, Indianapolis, IN, for Consolidated Rail Corporation.

Frederick W. Dennerline, III, Fillenwarth, Dennerline, Groth & Towe, Indianapolis, IN, Kevin C. Brodar (argued), United Transportation Union, Cleveland, OH, for United Transportation Union International, United Transportation Union Local 1963.

Vicki Laden, Claudia Center, Jennifer Middleton, Employment Law Center, San Francisco, CA, Arlene Mayerson, Berkeley, CA, for Amici Curiae, Employment Law Center, Disability Rights Education and Defense Fund, Inc., Epilepsy Foundation of America, The ARC, Judge David L. Bazelon Center for Mental Health Law, National Association of the Deaf, National Association of

Protection and Advocacy Systems, National Multiple, National Parent Network on Disabilities, World Institute on Disability.

Sally Dunaway, Michael R. Schuster, American Association of Retired Persons, Washington, DC, for Amicus Curiae, American Association of Retired Persons.

Ronald S. Honberg, National Alliance for the Mentally Ill, Arlington, VA, for Amicus Curiae, National Alliance for the Mentally Ill.

Catherine A. Hanssens, Lambda Legal Defense and Education Fund, New York City, for Amicus Curiae, Lambda Legal Defense & Education Fund, Inc.

Gwendolyn Young Reams, Carolyn L. Wheeler, Dori K. Bernstein (argued), C. Gregory Stewart, Equal Employment Opportunity Commission, Washington, DC, for Amicus Curiae, Equal Employment Opportunity Commission.

Joseph L. Manson, III, Verner, Liipfert, Bernhard, McPherson & Hand, Washington, DC, for Amicus Curiae, National Railway Labor Conference.

Douglas S. McDowell, Ann Elizabeth Reesman, Mary Chlopecki, McGuiness & Williams, Washington, DC, for Amicus Curiae, Equal Employment Advisory Council.

Thomas A. Woodley, Mulholland & Hickey, Washington, DC, for Amicus Curiae, International Association of Fire Fighters, AFL–CIO, CLC.

Before BAUER, CUDAHY, and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

Terry Eckles filed suit against his employer, Consolidated Rail Corporation ("Conrail"), and the local and national offices of his union, United Transportation Union ("the Union"), alleging violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* Eckles demanded certain "reasonable accommodations" under the ADA for his epilepsy, which the parties agree would have required infringement of the seniority rights of other employees under the collective bargaining agreement between Conrail and the Union. The district court granted summary judgment for the defendants, finding that the ADA did not require as a "reasonable accommodation" actions that would violate a bona fide seniority system at the expense of other employees. While we recognize the difficulty of the task of integrating the requirements of the ADA with seniority rights under a collective bargaining agreement, we agree with the conclusions of the district court's careful and thoughtful opinion, and we affirm.

## I.

The parties properly acknowledge that the legal question at issue has little to do with the specific facts of this case. Consequently, for the purposes of this appeal, the parties have agreed to accept the district court's characterization of the underlying facts. *See Eckles v. Consol. Rail Corp.,* 890 F.Supp. 1391, 1394–97 (S.D.Ind.1995). We refer the reader to this opinion for a fuller statement of the factual context of this case and here provide only a brief summary of the relevant facts.

Eckles began working for Conrail in 1992 as a yardmaster at its rail yard in Avon, Indiana. He was a member of the Union and was covered by the collective bargaining agreement in effect at the time between Conrail and the Union. His position required him to work varying shifts, including the third shift (11:00 p.m. to 7:00 a.m.),[1] and to work in a tower office that could be accessed only by climbing two to three flights of open, outdoor, metal stairs. Eckles was generally alone in the tower during his entire shift. During May of 1992, Eckles had a seizure and was diagnosed with epilepsy. Eckles' doctor released him to return to work in July, but advised that he should not work at heights because of the possibility of having a seizure and falling, and that he should not work the night shift because of the need for a regular sleep schedule.

---

1. Conrail's rail yards operate twenty-four hours a day, with the first shift running from 7:00 a.m. to *3:00 p.m. and the second shift running from 3:00 p.m. to 11:00 p.m.*

Because his position at Avon did not satisfy either requirement, Eckles notified ·Conrail that he wished to invoke Rule 2–H–1 of the collective bargaining agreement, which would potentially allow him to displace a more senior employee and obtain a job meeting his new restrictions. (There were no suitable jobs available to Eckles through the exercise of his seniority.) Rule 2–H–1 provides that upon written agreement by Conrail and the Union, a disabled employee may be allowed to take the position of, i.e., "bump," a more senior employee, in order to accommodate the disabled employee's job limitations.[2] By the end of July, Conrail and the Union agreed, under Rule 2–H–1, to allow Eckles to bump an employee on the second shift at Hawthorne Yard in Indianapolis—where the yardmaster office was at ground level. The bumped employee was more than thirty spots ahead of Eckles on the yardmaster seniority roster. In October, however, the Union rescinded its agreement to Eckles' placement under Rule 2–H–1, and by mid-November Eckles was bumped from his position at Hawthorne by a more senior employee.

Eckles then went on involuntary sick leave until April of 1993, when he exercised his seniority to obtain a newly opened position at Hawthorne. During June of that year, he had a seizure on the job and went back on involuntary sick leave. Eckles was cleared to return to work in September, with his original restrictions, but again the Union refused to agree to a special placement under Rule 2–H–1. By late October Eckles was able to bid for and obtain a position at Hawthorne, when the restriction on his working the third shift was relaxed. Eckles has held this position since October 1993, but because he holds the position via his seniority, rather than under Rule 2–H–1, he has no protection against being bumped from the job by a more senior employee.

In May of 1993, Eckles sued Conrail and the Union under the ADA, claiming that they had discriminated against him by refusing to provide reasonable accommodation for his disability—specifically, a yardmaster position at Hawthorne Yard.[3] The district court found that genuine issues of fact remained regarding whether Eckles was an "individual with a disability" under the ADA and whether he was offered another form of reasonable accommodation that he refused. The court concluded, however, that because the ADA did not require Conrail and the Union to violate the bona fide seniority rights of other employees under their collective bargaining agreement, summary judgment for Conrail and the Union was proper nonetheless.[4]

2. Rule 2–H–1 states as follows:
*Disabled employees-placement of.* (a) Subject to agreement, in writing, between the Manager–Labor Relations and Division Chairman, a disabled employee covered by this Agreement may be placed in a new position or vacancy, or position or vacancy that is under advertisement but not yet filled, or in a position occupied by another employee, without regard to seniority, provided such an employee is capable of performing the duties required. An employee who is so placed shall be compensated at the rate of the position in which he has been placed.
(b) An employee who has been placed in a position set forth in paragraph (a) hereof shall forfeit his right to continue in such position if he thereafter bids for other advertised positions or vacancies, and such position shall be advertised. In such case, if the disabled employee is not awarded the advertised position or vacancy for which he has bid[,] he shall exercise his seniority to a position the duties of which he is capable of performing.
(c) A position in which a disabled employee has been placed by agreement under paragraph (a) hereof shall not be subject to the seniority or advertising provisions of this Agreement, except that a disabled employee so assigned may be displaced by a senior qualified employee if there is no other position covered by this Agreement to which such senior employee can exercise seniority.

3. Although Conrail and the Union both proposed some alternative ways of dealing with Eckles' disability (such as providing a person to accompany him up and down the stirs at Avon), Eckles maintains that none of the suggested approaches would adequately accommodate his epilepsy. The district court found that the medical evidence in the record was too equivocal to conclusively establish that such accommodations could have adequately addressed Eckles' limitations. For the purposes of this summary judgment determination, the defendants accept this characterization.

4. Eckles also claimed that the collective bargaining agreement itself required that Conrail and the Union give him a special placement under Rule 2–H–1 and that Conrail had retaliated against him for filing a complaint with the Equal

## II.

■ We review the district court's grant of summary judgment *de novo*. *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir.1995). We will affirm the award of summary judgment only if the record, taken in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A factual dispute that does not affect the suit's outcome under governing substantive law, however, does not preclude summary judgment. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir.1992). Thus in this case, if the ADA never requires that the legitimate seniority rights of other employees under a collective bargaining agreement be sacrificed in order to "reasonably accommodate" a disabled employee, other factual disputes between the parties will not forestall the granting of summary judgment for the defendants.

Eckles maintains that in order to reasonably accommodate his epilepsy, the defendants were required to allow his transfer to the ground floor office at Hawthorne Yard and to provide him a preference in scheduling. Eckles acknowledges that in order to guarantee the position at Hawthorne necessary to comply with his medical restrictions-and Eckles argues that the ADA requires this guarantee as a "reasonable accommodation" of his disability—Conrail and the Union initially had to give him the right to bump a more senior employee from the desired job and now have to provide him with special protection from the normal operation of the seniority system, i.e., protect him from being bumped from his current job. Thus Eckles' position raises a potential conflict between the purported requirements of the ADA and the traditional operation of collectively bargained seniority systems under the Railway Labor Act ("RLA"), which governs the agreement between Conrail and the Union.[5]

■ The ADA prohibits employment discrimination against qualified individuals with disabilities. 42 U.S.C. § 12112(a). Under the ADA prohibited "discrimination" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability...." 42 U.S.C. § 12112(b)(5)(A). Such reasonable accommodations are required of "covered entities," which includes Conrail and the Union,[6] unless they can demonstrate that such an accommodation would impose an "undue hardship" on the operation of their business. *Id.* The defendants do not argue that the accommodation proposed by Eckles would impose an undue hardship on the operation of their business, but rather that the special treatment demanded by Eckles simply is not required as a "reasonable accommodation" under the ADA, due to its effects on the legitimate seniority rights of other employees. Therefore the question at issue is whether the ADA requires as "reasonable accommodation" that a disabled individual be given special job placement and job protection (from bumping) in violation of a bona fide seniority system in place under a

Employment Opportunity Commission and this lawsuit. The district court granted summary judgment for the defendants on both claims, and Eckles does not appeal the decision on those claims.

5. We note that the governing principles of the Railway Labor Act in this regard are not substantially different from those that apply under the National Labor Relations Act ("NLRA"). *See Trans World Airlines v. Indep. Fed'n of Flight Attendants*, 489 U.S. 426, 432–33, 109 S.Ct. 1225, 1229–30, 103 L.Ed.2d 456 (1989); *Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 377, 89 S.Ct. 1109, 1114–15, 22 L.Ed.2d 344 (1969). Hence we recognize that

our decision in this case will likely impact the interpretation of ADA "reasonable accommodation" in relation to seniority provisions within collective bargaining agreements governed by the NLRA, as well as by the RLA.

6. The ADA defines "covered entities" as follows: "The term 'covered entity' means an employer, employment agency, labor organization, or joint labor-management committee." 42 U.S.C. § 12111(2). While the ADA exempts certain employers, *see* 42 U.S.C. § 12111(5), Conrail does not deny that it is an ADA covered entity and neither does the Union.

collectively bargained agreement,[7] when such accommodation is the only way of meeting the job restrictions of that disabled individual.[8] This poses a conflict not so much between the rights of the disabled individual and his employer and union, but between the rights of the disabled individual and those of his co-workers.[9]

■ The ADA likewise prohibits "discrimination" defined as "participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited under this subchapter...." 42 U.S.C. § 12112(b)(2). Eckles maintains that the defendants also violated this provision. We find, however, that in the circumstances of this case, establishing a violation of section 12112(b)(2) depends upon establishing a violation of section 12112(b)(5)(A), since the only form of discrimination actually alleged is a failure to provide reasonable accommodation. If "reasonable accommodation" under the ADA does not require reassignment to a position held by another employee, the collective bargaining agreement at issue did not

subject Eckles to prohibited discrimination by establishing a bona fide seniority system that regulates the holding of positions at Conrail.[10] It is true that covered entities cannot avoid their ADA duties by contractual manipulation: "An employer cannot use a collective bargaining agreement to accomplish what it would be prohibited from doing under [the ADA]." S. REP. No. 116, 101st Cong., 1st Sess. 32 (1989) (hereinafter "S. REP."); H.R. REP. No. 485(II), 101st Cong., 2d Sess. 63 (1990) (hereinafter "H.R. REP."), reprinted in 1990 U.S.C.C.A.N. 303, 345. Yet Eckles does not claim that the seniority system was established, even in part, in order to bypass the duty to accommodate under the ADA; and there is no evidence of such subterfuge. Consequently, if the ADA does not require that collectively bargained seniority rights be compromised in order to reasonably accommodate a disabled individual, Eckles cannot establish that Conrail and the Union are guilty of participating in a contractual arrangement that has the effect of subjecting him to prohibited discrimination. Hence the issue is simply what is required by "reasonable accommodation."

7. A "bona fide" seniority system is one that was created for legitimate purposes, rather than for the purpose of discrimination.

8. Eckles and his supporting amici emphasize that contractual rights gained under collective bargaining agreements must give way to federally created civil rights. They rely on cases dealing with the question of whether independently existing federal civil rights had been *waived* by collective bargaining agreements. *See Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 51–52, 94 S.Ct. 1011, 1021–22, 39 L.Ed.2d 147 (1974) (individual rights conferred by Title VII could not be waived by collective bargaining); *E.E.O.C. v. Bd. of Governors of State Colleges and Univs.*, 957 F.2d 424, 431 (7th Cir.) ("[I]t is well established that unions cannot waive employees' ADEA or Title VII rights through collective bargaining."), *cert. denied*, 506 U.S. 906, 113 S.Ct. 299, 121 L.Ed.2d 223 (1992); *U.S.E.E.O.C. v. County of Calumet*, 686 F.2d 1249, 1255–56 (7th Cir.1982) (unions have no power to waive individual rights granted under ADEA). The defendants in this case do not argue, however, that their collective bargaining agreement effectively waived certain otherwise-viable employee rights to reasonable accommodation under the ADA. Rather, the issue in this case is whether the rights granted under the ADA itself extend so far as to trump otherwise legitimate, collectively-bargained seniority rights. We deal with the scope of the ADA's

coverage in the first instance, not whether coverage has been subsequently diminished by a collective bargaining agreement.

9. We most certainly do not here decide that *all* provisions of collective bargaining agreements will preempt a covered entity's duty to reasonably accommodate a disabled employee under the ADA. We address only collectively-bargained seniority systems that establish rights in other employees.

10. The House Report on the ADA explicitly recognizes that the contractual discrimination provision does not expand the duties imposed by the ADA. Looking at the text of section 12112(b)(2), the House Report concludes:

> The basic intent of this provision is that any entity may not do through a contractual provision what it may not do directly. The type of discrimination prohibited is that 'prohibited by this title'—i.e., that set forth in the substantive provisions of the bill.... The contractual relationship adds no new obligations in and of itself beyond the obligations imposed by the Act, nor does it reduce the obligations imposed by the Act.

H.R. REP. No. 485(II), 101st Cong., 2d Sess. 59–60 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 342.

In order to determine the meaning of "reasonable accommodation" under the ADA, we must look first to the text of the statute. *United States v. Ron Pair Enters.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989). The ADA defines "reasonable accommodation" as follows:

> The term "reasonable accommodation" may include—
>
> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
>
> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9). We note that the "reassignment to a vacant position" language cuts against Eckles' claim. While Congress certainly contemplated job structuring changes as part of reasonable accommodation, the suggestion that reassignment be to a *vacant* position suggests that Congress did not intend that other employees lose their positions in order to accommodate a disabled coworker.

Eckles and his supporting amici are quick to point out that no employee would be fired as a result of the proposed accommodation. Rather, one more senior employee would lose his current position and have to bid for another one—as initially occurred in this case when Conrail and the Union voluntarily agreed to allow Eckles to bump a more senior co-worker at Hawthorne—and the position acquired by the disabled individual would then essentially be "taken off the market," in terms of bidding by other employees. What would be lost to the other employees, particularly more senior employees, would be some of the value of their seniority with the company, not their employment. We also acknowledge that under a seniority system like that in place at Conrail, few positions are ever truly "vacant," in the sense of being unfilled. Rather, positions held by less senior employees are open to be bid upon and acquired by more senior employees, provided the bidding employee can meet the qualifications for the desired job. Within such a framework a "vacant position" would essentially be one that an employee could acquire with his seniority and for which he could meet the job requirements. Consequently, the accommodation demanded by Eckles does not constitute "reassignment to a vacant position," but goes further.

While the text of the ADA does not provide much support for Eckles' position, neither does it decisively answer the question of whether "reasonable accommodation" can require that the otherwise valid seniority rights of other employees be trumped. Thus we look also to the background of the ADA's "reasonable accommodation" concept and the legislative history of the ADA. As we noted in *Vande Zande v. State of Wis. Dep't of Admin.*, 44 F.3d 538, 542 (7th Cir.1995), the term "reasonable accommodation" in the ADA was apparently borrowed from the regulations issued by the Equal Employment Opportunity Commission ("EEOC") in implementation of the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.* See 29 C.F.R. § 1613.704; S. REP. at 31; H.R. REP. at 62, 1990 U.S.C.C.A.N. at 344. We also recognized that "to a great extent the employment provisions of the [ADA] merely generalize to the economy as a whole the duties, including that of reasonable accommodation, that the regulations under the Rehabilitation Act imposed on federal agencies and federal contractors." *Vande Zande*, 44 F.3d at 542. It is therefore appropriate that we look to decisions interpreting the requirements of the Rehabilitation Act for guidance in understanding the meaning of analogous requirements under the ADA. *Id.*

Unfortunately for Eckles, courts have been unanimous in rejecting the claim that "reasonable accommodation" under the Rehabilitation Act requires reassignment of a disabled employee in violation of a bona fide seniority system. In fact, a virtual per se rule has emerged that such reassignment is not required under the Rehabilitation Act's duty to reasonably accommodate. *See, e.g., Shea v. Tisch,* 870 F.2d 786, 789–90 (1st Cir.1989) (per curiam); *Carter v. Tisch,* 822

F.2d 465, 467–69 (4th Cir.1987); *Jasany v. United States Postal Service,* 755 F.2d 1244, 1251–52 (6th Cir.1985); *Mason v. Frank,* 32 F.3d 315, 319–20 (8th Cir.1994); *Daubert v. United States Postal Service,* 733 F.2d 1367, 1370 (10th Cir.1984); *cf. Tyler v. Runyon,* 70 F.3d 458, 468 (7th Cir.1995) (noting importance of plaintiff's lack of seniority in rejecting claim that Rehabilitation Act required employer to train him for new position). Eckles and the amici who support his position have not cited, and we are not aware of, a Rehabilitation Act decision holding that a particular reasonable accommodation was required even though it violated the provisions of a seniority system. Thus Congress drafted the ADA against the backdrop of well-established precedent that "reasonable accommodation" under the Rehabilitation Act had never been held to require trumping the seniority rights of other employees.

Title VII of the Civil Rights Act of 1964 also contains a duty of "reasonable accommodation," in this case to the religions of employees. Initially it emerged within 1966 EEOC guidelines interpreting Title VII, *see* 29 C.F.R. § 1605.2(b) (1968), and in 1972 it was incorporated into Title VII itself. 42 U.S.C. § 2000e(j). Under Title VII an employer must "reasonably accommodate" the religious observances and practices of its employees, up to the point of "undue hardship on the conduct of the employer's business." *Id.* In *Trans World Airlines v. Hardison,* 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), the Supreme Court considered a conflict between a demand for a particular "reasonable accommodation" under Title VII (being relieved from Saturday work duties, as required by the plaintiff's religion) and the seniority rights of other employees under a collective bargaining agreement (since more senior employees would be required to work in the plaintiff's stead). The Supreme Court decisively rejected the position of *Hardison* and the EEOC that the statutory require-

ment to accommodate necessarily superseded the collectively-bargained seniority rights of the other employees: "We agree that neither a collective bargaining contract nor a seniority system may be employed to violate a statute, but we do not believe that the duty to accommodate requires TWA to take steps inconsistent with the otherwise valid agreement." *Id.* at 79, 97 S.Ct. at 2274. The Court emphasized the importance of collective bargaining and the protected status of employee seniority rights obtained through such bargaining:

> Collective bargaining, aimed at effecting workable and enforceable agreements between management and labor, lies at the core of our national labor policy, and seniority provisions are universally included in these contracts. Without a *clear and express indication from Congress,* we cannot agree with *Hardison* and the EEOC that an agreed-upon seniority system must give way when necessary to accommodate religious observances.

*Id.* (emphasis added).[11] The language of the ADA, like that of Title VII, falls far short of providing a "clear and express indication from Congress" that it intended "reasonable accommodation" to include infringing upon the seniority rights of other employees.

We should not be understood as proposing that caselaw under either the Rehabilitation Act or Title VII can be simply imported wholesale when interpreting the meaning of "reasonable accommodation" and like terms under the ADA. We recognize that the ADA does expressly recognize "reassignment to a vacant position" as an expected form of reasonable accommodation, thereby rejecting a line of precedent under the Rehabilitation Act holding that reassignment of a disabled employee was *never* required. In addition, in *Hardison,* the Court found that "[t]o require TWA to bear more than a *de minimis* cost in order to give *Hardison* Saturdays off

---

11. The Supreme Court has recognized the value of seniority systems for neutrally distributing employment benefits in other contexts as well. *See, e.g., Franks v. Bowman Transp. Co.,* 424 U.S. 747, 766, 96 S.Ct. 1251, 1265, 47 L.Ed.2d 444 (1976) ("Seniority systems and the entitlements conferred by credits earned thereunder are of vast and increasing importance in the economic em-

ployment system of this Nation.... Seniority principles are increasingly used to allocate entitlements to scarce benefits among competing employees ... and to compute noncompetitive benefits earned under the contract of employment ....") (internal citation omitted); *Lorance v. AT & T Technologies, Inc.,* 490 U.S. 900, 912, 109 S.Ct. 2261, 2269, 104 L.Ed.2d 961 (1989).

is an undue hardship." 432 U.S. at 84, 97 S.Ct. at 2277. The Senate and House Reports on the ADA clarified that *Hardison's* statement that only *de minimis* costs were required for reasonable accommodation does not apply under the ADA. S. REP. at 36; H.R. REP. at 68, 1990 U.S.C.C.A.N. at 350.[12] Thus we do not maintain that the ADA duty of "reasonable accommodation" is equivalent to that under the Rehabilitation Act and Title VII; yet we recognize the usefulness of these acts for understanding the basic meaning of the term as it was being used at the time Congress decided to employ it within the ADA.[13]

Both sides and all of the amici in this case attempt to make much of certain aspects of the ADA's legislative history. Not surprisingly, the opposing positions rely on different parts of this history. We conclude, however, that this legislative history strongly supports the position of Conrail and the Union and only weakly supports that of Eckles. We provide the relevant sections in full, emphasizing the portions relied upon by the parties:

 Reasonable accommodation may also include reassignment to a vacant position. If an employee, because of a disability, can no longer perform the essential functions of the job that she or he has held, a transfer to another vacant job for which the person is qualified may prevent the employee from being out of work and [the] employer from losing a valuable worker. Efforts should be made, however, to accommodate an employee in the position that he or she was hired to fill before reassignment is considered. *The Committee also wishes to make clear [that] reassignment need only be to a vacant position—"bumping" another employee out of a position to create a vacancy is not required.*

The section 504 regulations provide that "a recipient's obligation to comply with this subpart [employment] is not affected by any inconsistent term of any collective bargaining agreement to which it is a party." 45 C.F.R. § 84.11(c). The policy also applies to the ADA. Thus, an employer cannot use a collective bargaining agreement to accomplish what it otherwise would be prohibited from doing under this Act. For example, a collective bargaining agreement that contained physical criteria which caused a disparate impact on individuals with disabilities and were not job-related and consistent with business necessity could be challenged under this Act.

The collective bargaining agreement could be relevant, however, in determining whether a given accomodation [sic] is reasonable. For example, if a collective bargaining agreement reserves certain jobs for employees with a given amount of seniority, it may be considered as a factor in determining whether it is a reasonable ac-

---

12. The House Report explained as follows: "By contrast, under the ADA, reasonable accommodations must be provided unless they rise to the level of 'requiring significant difficulty or expense' on the part of the employer, in light of the factors noted in the statute—i.e., a significantly higher standard than that articulated in *Hardison*." H.R. REP. at 68, 1990 U.S.C.C.A.N. at 350. While both the Senate and House Reports contain the statement that "the principles enunciated by the Supreme Court in [*Hardison*] are not applicable to this legislation," S. REP. at 36; H.R. REP. at 68, 1990 U.S.C.C.A.N. at 350, it is clear from the context of this statement-particularly in the House Report—that Congress intended to reject the *de minimis* rule of *Hardison,* rather than the overall holding of the case or the refusal to require an employer to violate the seniority rights of other employees to accommodate the religious restrictions of the plaintiff.

13. Eckles notes that Title VII, unlike the ADA, contains express language exempting the operation of bona fide seniority systems from its defini-tion of unlawful employment practices. *See* 42 U.S.C. § 2000e–2(h). Eckles argues that the ADA's lack of such an express exemption demonstrates that reasonable accommodation under the ADA should trump seniority systems. The major problem with this argument, however, is that the Rehabilitation Act contained no such exemption; yet (as noted above) courts have unanimously concluded that reasonable accommodation under that Act does not include infringing upon seniority rights. Thus the absence of an express protection of seniority rights in the ADA is not determinative. We also note that the structure and language of the Supreme Court's opinion in *Hardison* make apparent that the decision in that case did not depend on Title VII's seniority provision. *See* 432 U.S. at 79–82, 97 S.Ct. at 2274–76 (noting that the Court's already-stated conclusion was "supported by the fact that seniority systems are afforded special treatment under Title VII itself").

commodation to assign an employee with a disability without seniority to the job. *However, the agreement would not be determinative on the issue.*

H.R. REP. at 63, 1990 U.S.C.C.A.N. at 345 (emphasis added).[14] This section appears within a broader discussion of reassignment as a form of "reasonable accommodation" under the ADA. Both the Senate and House Reports explicitly state that "bumping" is not required, which would seem to clear up any remaining doubt about whether the ADA required bumping in this particular case. S. REP. at 32; H.R. REP. at 63, 1990 U.S.C.C.A.N. at 345. After clarifying that reassignment can only be to an unoccupied position, the reports address another possible barrier to reassignment: not being qualified for the position sought, either due to not meeting the established physical criteria or the seniority minimum (e.g., two years of experience with the company).

Because of the danger of manipulating such standards (especially physical standards) to discriminate against the disabled, the reports find that these standards should be evaluated for their legitimacy, rather than merely accepted as automatically preempting a particular reasonable accommodation. For example, are the physical criteria "job-relat-

ed and consistent with business necessity"? The emphasis is on the theme that a covered entity "cannot use a collective bargaining agreement to accomplish what it otherwise would be prohibited from doing" under the ADA.[15] *Id.* The language about collective bargaining agreements being "relevant but not determinative" appears in the context of this discussion about reassignment to a vacant position for which the disabled individual does not meet the pre-set job criteria. Thus a provision in the collective bargaining agreement that an employee could only be a second-shift welder after two years with the company would be relevant but not determinative to deciding whether the ADA requires, as a "reasonable accommodation," that the disabled one-year employee be reassigned to a second-shift welder position. The finding that "bumping is not required" is distinct and independent from this later discussion.

■ We further note that Rule 2–H–1 within the collective bargaining agreement between Conrail and the Union does not affect our resolution of the case at hand. Rule 2–H–1 represents a level of enhanced sensitivity to the needs of the disabled that Congress envisioned under the ADA but did not require.[16] The defendants were not obli-

**14.** The text of the Senate Report differs slightly. It contains an identical sentence about bumping not being required and also the final paragraph quoted above, but minus the concluding "not determinative" sentence. S. REP. at 32.

**15.** Thus we reject the arguments of Eckles and his supporting amici that this passage implies that summary judgment is inappropriate in cases such as this one, since the trier of fact should be given the task of "balancing" the interests of the disabled employee against those of more senior co-workers to determine whether a given accommodation is "reasonable" or not. This was the approach taken by the district court in *Emrick v. Libbey–Owens–Ford Co.*, 875 F.Supp. 393, 395–97 (E.D.Tex.1995). We note, however, that the *Emrick* court considered neither the fact that the ADA refers to reassignment to a *vacant* position, nor the clear statement in the Senate and House Reports that bumping is not required (though it did quote the succeeding language about the collective bargaining agreement being only "a factor" in the reasonable accommodation determination). In addition, the *Emrick* court stands alone in its balancing approach (while the Fifth Circuit's decision in *Daugherty v. City of El Paso,*

56 F.3d 695, 700 (5th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1263, 134 L.Ed.2d 211 (1996), raises questions about the continuing vitality of its conclusion even in its own district); and the balancing approach itself lacks any clear standards. While the ADA does provide statutory factors to be considered in determining whether a particular accommodation would produce an "undue hardship" for a covered entity like an employer or union, *see* 42 U.S.C. § 12111(10)(B), it does not contain any analogous criteria for evaluating the effect of a given accommodation on other employees—who do not formally qualify as "covered entities" under the ADA. 42 U.S.C. § 12111(2).

**16.** The following language from the House Report on the ADA reflects the difference between what Congress was prepared to mandate and what it merely advocated: "Conflicts between provisions of a collective bargaining agreement and an employer's duty to provide reasonable accommodations may be avoided by ensuring that agreements negotiated after the effective date of this title contain a provision permitting the employer to take all actions necessary to comply with this legislation." H.R. REP at 63, 1990 U.S.C.C.A.N. at 346.

gated by the ADA to adopt this Rule, and we will not hold them to more than the Rule itself requires. The language of Rule 2–H–1 imposes no requirement that Conrail and the Union agree to reassignment of a disabled employee in violation of the seniority rights of another employee, rather it simply allows for such a compromise at the option of both parties.[17] Because their initial agreement to place Eckles under this rule, i.e., to bump a more senior employee to accommodate Eckles, was purely discretionary, both Conrail and the Union remained free to rescind their consent to Eckles' placement; and the Union did so.[18] Eckles did not garner any new rights under the ADA to protection against being bumped by more senior employees through his temporary special placement under Rule 2–H–1.[19]

Finally, we address the position of the EEOC, which filed an amicus brief in support of Eckles. The EEOC's position in this case is rather curious. First, the EEOC explicitly acknowledges that "the ADA does not require displacement or 'bumping' of another employee to accommodate a disabled individual." But then it argues that under the ADA employers and unions faced with a disability case like that of Eckles have a duty "to negotiate in good faith a variance from collectively bargained seniority rules when the only available effective accommodation contravenes these rules and the proposed accommodation will not unduly burden other employees." This approach is admirable in

its desire for moderation and compromise (not to mention its creativity). We find, however, that it lacks any foundation in the text, background, or legislative history of the ADA. While Congress could certainly choose to enact such a rule, it has not done so thus far; and we are not free to rewrite the ADA on our own. The unwieldiness of the proposed rule, in contrast to the "no bumping required" rule that we find in the ADA, is but further disincentive to "discover" such a rule within the overall gestalt of the ADA.

After examining the text, background, and legislative history of the ADA duty of "reasonable accommodation," we conclude that the ADA does not require disabled individuals to be accommodated by sacrificing the collectively bargained, bona fide seniority rights of other employees. The other circuit courts that have addressed this question have reached this result as well. *See Benson v. Northwest Airlines,* 62 F.3d 1108, 1114 (8th Cir.1995); *Wooten v. Farmland Foods,* 58 F.3d 382, 386 (8th Cir.1995); *Milton v. Scrivner, Inc.,* 53 F.3d 1118, 1125 (10th Cir. 1995); *cf. Daugherty v. City of El Paso,* 56 F.3d 695, 700 (5th Cir.1995) ("[W]e do not read the ADA as requiring affirmative action in favor of individuals with disabilities, in the sense of requiring that disabled persons be given priority in hiring or reassignment over those who are not disabled."), *cert. denied,* —— U.S. ——, 116 S.Ct. 1263, 134 L.Ed.2d 211 (1996).[20] We emphasize that

---

**17.** In addition, the Rule also provides that even a disabled employee placed under the Rule is not protected from being bumped by a more senior qualified employee if there is no other position available for which that senior employee is eligible. *See supra* note 2, Rule 2–H–1(c).

**18.** Eckles and his supporting amici emphasize that under the ADA, unlike the Rehabilitation Act and Title VII, unions (along with employers) are "covered entities" with a duty to reasonably accommodate. 42 U.S.C. § 12111(2). Hence, unions, no less than employers, are prohibited by the ADA from negotiating a collective bargaining agreement that violates the rights of disabled workers by undermining the union's ability to reasonably accommodate these workers. The Union's status as a covered entity does not increase the scope of Eckles' right to the desired "reasonable accommodation" in this case, however, since (as already noted) bumping is simply

not a required "reasonable accommodation." Furthermore, nothing in the ADA mandates that an employer or a union negotiate a variance to bona fide seniority rights under a collective bargaining agreement in order to allow such bumping.

**19.** There is no allegation in this case that Rule 2–H–1 was either adopted with a discriminatory purpose or applied in a discriminatory manner. Thus the ADA's prohibition on discriminatory contractual provisions, 42 U.S.C. § 12112(b)(2), is not relevant to our analysis. We do not here consider the situation where such a rule is applied unevenly among employees requesting special placement or other accommodation.

**20.** In addition, we have recently held that a loss of seniority due to a pre-ADA onset of a disability (and resulting temporary loss of position) did not require an employer, after the effective date of

our conclusion is limited to individual seniority rights and should not be interpreted as a general finding that all provisions found in collective bargaining agreements are immune from limitation by the ADA duty to reasonably accommodate. The ADA does not lack force in the unionized workplace, and the duty to provide for the special needs of disabled workers cannot be voided by either skillful manipulation (such as a pretextual seniority system) or inadvertence. We recognize that many of the "reasonable accommodations" specifically proposed within the ADA also have effects on other workers, but find that collectively bargained seniority rights have a pre-existing special status in the law and that Congress to date has shown no intent to alter this status by the duties created under the ADA.

For the foregoing reasons we AFFIRM the district court's grant of summary judgment for Conrail and the Union.

the ADA, to retain the affected employee, despite his lack of seniority, in a subsequent general reduction in force. *Kennedy v. Chemical Waste Management, Inc.,* 79 F.3d 49 (7th Cir.1996). "The notion of reasonable accommodation can-not be stretched to the point of requiring the provision of superseniority to disabled employees who lost their seniority on account of disability years, perhaps decades, before the Americans With Disabilities Act was passed." *Id.* at 52.