William P. COLLINS, Plaintiff,

v.

YELLOW FREIGHT SYSTEM, INC., Defendant.

No. 95–0139–CV–W–3.

United States District Court, W.D. Missouri, Western Division.

Oct. 4, 1996.

Gregory E. Eufinger, Jr., Ross, Eufinger & Sousley, Kansas City, MO, for plaintiff William P. Collins.

Robert W. McKinley, Tedrick A. Housh, III, Swanson, Midgley, Gangwere, Kitchin & McLarney, L.L.C., Kansas City, MO, for defendant Yellow Freight Systems, Inc.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

SMITH, District Judge.

This case arises from Plaintiff's claim that he was discriminated against in violation of the Americans with Disabilities Act when Defendant failed to return him to his job as a hostler. The case was tried to the bench on September 24–25, 1996. In addition, at the suggestion of Defendant and with Plaintiff's consent, the undersigned visited Defendant's facilities to observe the nature of a hostler's work.

The following represents the Court's findings of fact and conclusions of law. To the extent a finding of fact contains a conclusion of law, it should be so construed; similarly, to the extent a conclusion of law contains a finding of fact, it should be so construed.

### I. FINDINGS OF FACT

1. Plaintiff is a resident of Independence, Missouri, which lies in the Western District of Missouri.

2. Defendant is an Indiana corporation registered to do (and doing) business in the

State of Missouri, with its general corporate offices located in Overland Park, Kansas.

3. Plaintiff has complied with the following jurisdictional prerequisites of Title VII of the Civil Rights Act of 1964:

    a. On or about February 9, 1993, Plaintiff filed a written complaint with the Equal Employment Opportunity Commission ("EEC");

    b. More than 180 days thereafter, Plaintiff received a right to sue notice from the EEC; and

    c. Plaintiff filed the instant Complaint in this Court within 90 days after his receipt of the right to sue notice from the EEC.

4. Defendant is an employer within the meaning of Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.*, and Defendant is a "covered entity" within the meaning of 42 U.S.C. § 12111(2).

5. On April 19, 1972, Plaintiff was hired by the Defendant, and at all times relevant to this lawsuit, Plaintiff worked at Defendant's facilities in Kansas City, Missouri. The terms and conditions of his employment were governed by a collective bargaining agreement ("CBA") between the Teamsters Union and Defendant for the period of April 1, 1991 through March 31, 1994.

6. On January 12, 1992, Plaintiff suffered an injury to his back while performing his duties at work. At the time, Plaintiff was working as a "road hostler". From the date of his injury until September 13, 1995, Plaintiff was not employed by Defendant in any capacity.

7. Generally speaking, a road hostler's duties entail positioning, attaching and detaching tractor trailer rigs. Trailers are connected to rigs by "dollies," which are large devices (weighing approximately 1000 pounds) with large tires on one end and a small metal wheel on the other; the dolly connects to a truck or to the back of a trailer on the end opposite from the large tires. A trailer connects to the dolly above the dolly's wheels. Disconnecting a trailer from the dolly requires disconnecting some cables and pulling the "fifth wheel" lever, which disengages the trailer from the dolly. A crank is turned to lower support legs from the trailer to the ground. Removing the dolly from the trailer involves disconnecting the dolly and physically rolling it a short distance from the truck. Connecting the dolly to a truck or trailer requires the reverse of these processes.

8. Immediately following his injury on January 12, 1992, Plaintiff received medical treatment from North Kansas City Hospital and physicians at Industrial Clinic North.

9. On February 17, 1992, Plaintiff was examined by Dr. Robert J. Takacs, M.D.

10. On March 3, 1992, Plaintiff was examined by Dr. Melvin D. Kargas, M.D.

11. From April 15, 1992 to September 8, 1992, Plaintiff was examined and treated by Dr. Lowry Jones, M.D.

12. On May 28, 1992, Plaintiff filed an Amended Claim for Compensation with the Missouri Department of Labor and Industrial Relations, Workers' Compensation Division. This claim was settled on November 17, 1992.

13. On June 2, 1992, Dr. Jones released Plaintiff with permanent restrictions and a permanent partial disability rating of 25% to the body as a whole, stating he did not believe Plaintiff would be able to return to his normal activity in the near future.

14. On July 24, 1992, Dr. Jones wrote a letter to Defendant stating that he did not know if Plaintiff would ever be able to return to work as a hostler and that due to his permanent restrictions he was not eligible to return to either his normal duties or to a transitional work program.

15. On September 10, 1992, Dr. Jones wrote another letter to Defendant setting forth a new list of restrictions and establishing a permanent partial disability rating of 11% to the body as a whole. Dr. Jones further declared that Plaintiff was released to work with these limitations; significantly, however, Dr. Jones did not change his prior opinion that Plaintiff's physical restrictions were permanent in nature.

16. On September 24, 1992, Dr. Jones clarified his September 10th report, stating that Plaintiff did not fit the qualifications to re-

turn to his previous job, and that if no light duty was available he was unable to work. The September 24 letter did not declare that Dr. Jones had changed his mind regarding the permanent nature of Plaintiff's restrictions.

17. On November 13, 1992, Plaintiff was examined by Dr. Harold West, M.D., at his own expense, whose report stated that Plaintiff was able to return to a light duty status and may be able to return to full duty with a work hardening program. Significantly, Dr. West did not unequivocally declare that Plaintiff's restrictions were temporary in nature—thereby justifying Defendant's continued reliance on Dr. Jones' opinion that the restrictions were permanent.

18. Article 14, section 2 of the CBA establishes a "Modified Work Program," which is a "temporary opportunity [for] those employees who are unable to perform their normal work assignments due to a disabling on-the-job-injury."

19. Article 14, section 2(c) of the CBA states that "[i]t is understood and agreed those employees who, consistent with professional medical evaluations opinion, may never be expected to receive an unrestricted medical release, shall not be eligible to participate in a modified work program."

20. Article 47, section 1 of the CBA provides as follows:

Physical, mental or other examinations required by a government body or the Employer shall be promptly complied with by all employees. The Employer pay for all such examinations for all regular and probationary employees. The Employer shall not pay for any time spent in the case of applicants for jobs and shall be responsible to other employees only for time spent at the place of examination or examinations, where the time spent by the employee exceeds two (2) hours and in that case, only for those hours in excess of said two (2). Examinations are to be taken at the employee's home terminal and not to exceed one (1) in any one (1) year, regardless of age, unless the employee has suffered serious injury or illness during the year. Employees will not be required to take examinations during their working hours.

The Employer reserves the right to select its own medical examiner or doctor, and the Union may, if it believes an injustice has been done an employee, have said employee reexamined at the Union's expense.

In the event of disagreement between the doctor selected by the Employer and the doctor selected by the Union, the Employer and Union doctors shall together select a third (3rd) doctor within seven (7) days, whose opinion shall be final and binding on the Company, the Union and the employee. The company nor the Union nor the employee will attempt to circumvent the decision. The expense of the third (3rd) doctor shall be equally divided between the Employer and the Union. Disputes concerning back pay shall be subject to the grievance procedure.

21. On January 12, 1993, Plaintiff was examined by Dr. Michael Poppa, D.O., at Defendant's request, whose report stated that Plaintiff was unable to return to work without permanent restrictions and that Plaintiff was at significant risk for injury should he be placed in a work environment which required repetitive bending, twisting and lifting which exceeded the recommended capabilities as set forth by Dr. Jones.

22. On January 20, 1993, Dr. Poppa wrote a letter to defendant stating that Plaintiff was not able to return to *any* employment with Defendant due to his permanent restrictions.

23. On March 4, 1993, pursuant to the resolution of a union grievance filed by Plaintiff, and pursuant to the "third doctor" provisions of Article 47 of the CBA, Plaintiff was examined by Dr. Brent Koprivica, M.D., whose report stated that Plaintiff was unable to return to work without permanent restrictions, and that Plaintiff was at risk of reinjury.

24. On September 13, 1993, after reviewing new job descriptions for city and road hostler jobs, Dr. Poppa sent a letter to Defendant stating Plaintiff was unable to perform the essential functions of these jobs.

25. On October 6, 1993, after reviewing job descriptions for city and road hostler jobs, Dr. Koprivica sent a letter to Defendant stating Plaintiff was unable to perform the essential functions of these jobs.

26. On October 28, 1993, Plaintiff was examined by Dr. J. Michael Smith, M.D., at his own expense. Dr. Smith's report stated that Plaintiff could return to work full-time without restrictions.

27. On November 18, 1993, after reviewing a new functional capacities evaluation, Dr. Koprivica sent another letter to Defendant stating that Plaintiff could not return to work as a city hostler or a road hostler.

28. In December 1993 Plaintiff filed another union grievance challenging the selection of Dr. Koprivica as the neutral "third doctor." Plaintiff prevailed in this grievance and Dr. Robert Drisko was selected as second "third doctor" in this matter.

29. Dr. Drisko examined Plaintiff on August 16, 1994 and, in a report dated September 5, 1994, stated that Plaintiff could return to work without restrictions. Plaintiff returned to work as a hostler for Defendant approximately one week later.

## II. CONCLUSIONS OF LAW

The Court concludes that it has jurisdiction over the Defendant and over the Plaintiff's claims, and that venue is proper in this Court.[1]

The ADA prohibits employment discrimination "against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). Plaintiff contends that he was "disabled" because Defendant regarded him as having an impairment that substantially limited one or more of his major life activities—in this case, the major life activity of working. See id. § 12102(2)(C).[2]

Although Plaintiff may have been disabled within the meaning of the Act, the Court concludes that he was not a "qualified individual with a disability." To meet his burden of proof on this point, Plaintiff must demonstrate (by a preponderance of the evidence) that he has a disability and that "with or without reasonable accommodation, [he] can perform the essential functions of the employment position that such individual holds or desires." Id. § 12111(8). Plaintiff attempts to carry this burden by pursuing two tacts: (1) though Defendant perceived him to be permanently unable to perform his job duties, this perception was false, and (2) Defendant should have permitted Plaintiff to enter the Modified Work Program. Both arguments are unpersuasive.

Plaintiff contends Defendant misled doctors by not properly advising them of a hostler's duties and functions. However, based on Plaintiff's description of his duties and the Court's observation of hostlers performing their job, the Court concludes that a hostler is required to do a significant amount of reaching, bending, stooping, pushing and pulling. In terms of Plaintiff's back condition, tasks that properly give rise to concern include pushing and pulling the dollies into position and pulling the fifth wheel lever in inclement weather (when the lever

---

**1.** In its Motion for Summary Judgment, Defendant contended that Plaintiff's claims were barred because he had not filed a grievance regarding his claims. In an Order dated September 6, 1996, the Court rejected this argument. Subsequent to that Order, the Eighth Circuit declared that such exhaustion was not required by Title VII of the Civil Rights Act. *Varner v. National Super Markets, Inc.,* 94 F.3d 1209, 1212–13 (8th Cir.1996). *Varner* provides further support for the Court's conclusions on this issue.

**2.** Defendant relies on *Wooten v. Farmland Foods,* 58 F.3d 382 (8th Cir.1995) to suggest that Plaintiff's impairment did not limit one or more life activities. *Wooten* acknowledged that working can constitute a major life activity, but cautioned that "[w]orking does not mean working at a particular job of that person's choice.... [a]n impairment that disqualifies a person from only a narrow range of jobs is not considered a substantially limiting one." 58 F.3d at 386 (quotations omitted). Recently, however, the Eighth Circuit provided the following example: "[a]n individual who has a back condition that prevents the individual from performing any heavy labor job would be substantially limited in the major life activity of working because the individual's impairment eliminates his or her ability to perform a class of jobs." *Webb v. Garelick Mfg. Co.,* 94 F.3d 484 (8th Cir.1996). In light of the Court's ruling, there is no need to reconcile these decisions and determine whether Plaintiff has been limited in a "major life activity."

is likely to stick and resist being disengaged). Repetitive reaching and bending may also be of concern in light of Plaintiff's back condition. The Court further notes that many of the doctors' restrictions were expressed as limitations on Plaintiff's physical ability (as opposed to unqualified statements that Plaintiff simply could not work), which Defendant then considered in determining whether Plaintiff was fit to do his job. This fact minimizes the relevance of inappropriate job descriptions that may have been delivered to doctors. In assessing whether a person is a qualified person with a disability, "consideration shall be given to the employer's judgment as to what functions of a job are essential." *Id.* For instance, Defendant was entitled to conclude, as it did, that restrictions on Plaintiff's ability to lift, carry and bend restricted his ability to, for instance, push and pull dollies—particularly in light of the fact that dollies weigh approximately 1000 pounds. As the weight suggests, a great deal of effort is required to roll a dolly—not only because dollies are rather heavy, but also because the metal wheel on the front does not roll easily on asphalt (particularly in inclement weather). After reviewing the evidence the Court concludes that Defendant's judgment that Plaintiff was not physically capable of returning to his job as a hostler without serious risk of reinjury was reasonably exercised.

Plaintiff's suggestion that he could have been accommodated by being placed in the Modified Work Program is misplaced because, until Dr. Drisko declared (on September 5, 1994) that Plaintiff was capable of returning to work, Defendant had no obligation or reason to believe that Plaintiff's disability was temporary. According to the CBA, only employees with temporary disabilities were permitted into the Modified Work Program, and Defendant was not required to contravene this provision of the CBA in order to accommodate Plaintiff. *Eckles v. Consolidated Rail Corp.,* 94 F.3d 1041, 1048 (7th Cir.1996); *Mason v. Frank,* 32 F.3d 315, 318

(8th Cir.1994) (discussing accommodation under the Rehabilitation Act);[3] *see also Cook v. Chrysler Corp.,* 981 F.2d 336, 338–39 (8th Cir.1992); *cert. denied* 508 U.S. 973, 113 S.Ct. 2963, 125 L.Ed.2d 663 (1993) (discussing accommodation of religious beliefs). Furthermore, pursuant to the CBA, Defendant was not obligated to accept Dr. Smith's opinion until another doctor agreed with it.

Nothing in the record persuades the Court that Defendant's perceptions of Plaintiff's physical capabilities was incorrect. Furthermore, the Court notes that, because Plaintiff contends he was disabled because Defendant perceived him to be so, "[t]he focus is on the impairment's effect upon the attitudes of others." *Wooten v. Farmland Foods,* 58 F.3d 382, 385 (8th Cir.1995). The reason for including an employer's perception as a consideration is to "combat the effects of 'archaic attitudes', erroneous perceptions, and myths that work to the disadvantage of persons with or regarded as having disabilities." *Id.* In this regard, it is significant that Defendant's "perception was not based upon speculation, stereotype, or myth, but upon a doctor's written restriction of [Plaintiff's] physical abilities." Although this fact is not determinative of the outcome of this case, it is relevant in ascertaining whether the Defendant had a legitimate, nondiscriminatory justification for its actions.

### III. CONCLUSION

For the foregoing reasons, judgment is entered in favor of the Defendant. IT IS SO ORDERED.

---

**3.** Cases construing the Rehabilitation Act are instructive when construing the ADA. *See, e.g.,*

*Wooten,* 58 F.3d at 386 n. 2 (8th Cir.1995).