In the
United States Court of Appeals
For the Seventh Circuit

No. 99-1155

Equal Employment Opportunity Commission,

Plaintiff-Appellee,

v.

Indiana Bell Telephone Co., Inc., d/b/a
Ameritech Indiana, and Ameritech Corp.,

Defendants-Appellants.

Appeal from the United States District Court
for the Southern District of Indiana,
Indianapolis Division.
No. IP-95-217-C M/S--Larry J. McKinney, Judge.

Argued November 12, 1999--Decided May 26, 2000

   Before Flaum, Ripple, and Rovner, Circuit
Judges.

   Flaum, Circuit Judge.  The defendants,
Indiana Bell Telephone Co., doing
business as Ameritech Indiana, and
Ameritech Corp. (collectively referred to
as "Ameritech") appeal the judgment
entered against them following a jury
trial in the United States District Court
for the Southern District of Indiana. The
defendants contend that the evidence
presented at trial was insufficient to
support the jury's verdict. In addition,
the defendants allege various errors by
the district court concerning the
admission of evidence and the jury
instructions. For the reasons stated
below, we reverse and remand this case to
the district court for further
proceedings consistent with this opinion.

I.  Facts
A.
   This appeal arises out of a suit brought
by the Equal Employment Opportunity
Commission ("EEOC" or "Commission") on
behalf of the claimants alleging that
Ameritech engaged in unlawful employment
discrimination in violation of Title VII

of the Civil Rights Act of 1964, 42 U.S.C. sec. 2000e et seq. The sexual harassment claims upon which the EEOC's suit is based stem from a course of sexually offensive conduct that former Ameritech employee Gary Amos directed at several of his female co-workers. Although only those incidents that occurred after November 21, 1991 can serve as a basis for holding Ameritech liable for Amos's actions, all of the incidents are relevant to Ameritech's knowledge of Amos's propensity to harass women and to the reasonableness of Ameritech's response./1 As such, it is necessary to recount the entire series of incidents constituting Amos's allegedly offensive conduct.

In 1975, Amos was employed in Ameritech's coin center with Barbara Huckeba. At trial, Huckeba testified that Amos exposed himself to her on three separate occasions. Huckeba also stated that she reported these incidents to her supervisor. Ameritech discharged Huckeba on October 24, 1975, citing her problems with Amos and its belief that Huckeba, as a white female, could more readily find another job than Amos, a black male. All of the complaints surrounding Huckeba's encounters with Amos were expunged from Amos's employment record, but two complaints about Amos's behavior during 1975 were not expunged. These complaints indicate that Amos brushed one co-worker's buttocks as she bent over, and that Amos partially exposed his penis to another co-worker.

In February 1988, Amos engaged in conduct that Jacquelyn Stine, a co-worker with whom he was training to be a customer service representative, found offensive. Stine testified that this conduct included telling Stine he was in love with her, smelling Stine's hair and telling her it was beautiful, and running a strand of Stine's hair through his mouth. During Stine's last encounter with Amos, Amos pushed himself against Stine as she stood at a vending machine and Stine noticed that Amos had an erection. As a result of these problems with Amos, Stine left the customer service training program and returned to her previous job as an operator. A copy of Stine's complaint against Amos was placed in his file, but Ameritech did not discipline Amos at this time.

An Ameritech report indicates that on July 18, 1989, Amos continued his offensive conduct by partially exposing his penis to a co-worker while seated in the back of a van. Janie Kern, the co-worker involved in this incident, reported Amos's conduct to Ameritech. At this point, Ameritech warned Amos that he would be disciplined if he were found at fault in any future allegations of sexual harassment.

In 1990, six female Ameritech employees formally complained to Ameritech about Amos's conduct in the small business office where he worked. Of these six women, five indicated that Amos had rubbed his penis against them. Ameritech investigated these complaints and suspended Amos for two weeks. In addition, Ameritech stripped Amos of a sales award and informed him that he faced termination for any such future incidents. At the time the decision to suspend Amos was made, Ameritech did not review Amos's personnel files, nor were any of the supervisors involved in the decision aware of Amos's past history of misconduct.

Despite the two-week suspension, Amos continued his harassing behavior. In early 1991, Debbie Murray, one of Amos's co-workers in the small business office, asked to move to a different desk because Amos was making improper comments. These comments included inviting Murray over to his house and asking her whether she ate breakfast alone. That same year, Ameritech received an anonymous letter claiming that Amos was still sexually harassing women in the workplace. In the investigation that followed, at least three women confirmed that Amos was still engaging in sexually harassing conduct.

In February 1992, Jennifer Rice, another employee in Ameritech's small business office, complained about Amos's conduct. Rice stated that Amos rubbed himself against her, rubbed her neck, and made inappropriate comments about her body. In response to Rice's complaint, Brian Bauer, the direct supervisor of both Amos and Rice, and Darlene Olberding, who was in charge of the managers in the small business office, met with Amos. Amos was informed that he could not have any physical contact with anyone in the

office, and that further misconduct could result in his suspension or termination. Amos expressed interest in moving out of the small business office, but Bauer told him that a transfer would not be the answer.

One of the claimants in this case, Debbie Wentland, was also employed in the small business office and was seated in a four-person cubicle directly across the aisle from Amos's cubicle. Initially, Amos and Wentland engaged in only innocuous conversations, but during one encounter Amos walked behind Wentland's chair and placed his hands on her shoulders. Wentland also testified that Amos rubbed and touched his crotch area on a daily basis. At various times, Amos would approach Wentland and touch her, including standing close enough to her desk that their legs touched and rubbing his hand up and down her back. Wentland asked Amos to stop touching her. She complained to Bauer in November 1992 after an incident in which Amos patted her stomach and said "Oh, so you are going to be a mom," and then followed her to her desk where he continued to talk to her while rubbing his erect penis through his pants.

Bauer met with Wentland on November 25, 1992 and informed her that he would forward her complaint to Monica Sharp, Ameritech's Equal Employment Opportunity ("EEO") Coordinator. Sharp first met with Wentland to discuss Amos's conduct, and then met with Amos on two occasions. Sharp informed Amos that he had violated the previous warning not to touch anyone in the office. On December 18, 1992, Sharp recommended that Amos be terminated based on her conclusion that Amos "d[id not] seem able to control himself at Indiana Bell." After forwarding this recommendation to Ameritech's legal department, Sharp went on vacation.

On December 28, 1992, Labor Relations manager Joyce Leck returned from vacation and, after reviewing Sharp's recommendation that Amos be terminated, noticed that the thirty-day period for disciplinary action provided for in the collective bargaining agreement had expired. Because Ameritech missed the deadline for disciplining Amos, the company did not take any action against him. However, Sharp did meet with Leck

and an official from Ameritech's legal department. They agreed that the next complaint against Amos would result in an immediate suspension pending investigation in order to avoid missing any deadlines./2 Amos was then informed that he was not being disciplined because of an administrative error, but that any further misconduct could result in his suspension or termination.

In January 1993, Sharp began an investigation to determine whether Amos was continuing to harass Wentland or any of the other service representatives. While Wentland stated that Amos had not harassed her again, she did recommend that Sharp speak to Lori Everts or Patricia Black. Everts, a chief union steward and a claimant in this case, refused to talk to Sharp because she regarded it as a conflict of interest to assist the company in investigating a member of the union. After an unproductive meeting with Black, during which a union steward continually interrupted the interview, Sharp became angry at what she regarded as union interference with the investigation. Sharp informed Leck, Ameritech's Labor Relations manager, of her concerns. Leck then informed the union president that the company intended to hold the union liable if it were sued as a result of Amos's conduct.

On April 15, 1993, Everts filed a charge with the EEOC based on Amos's conduct. In her charge, Everts stated that Amos walked around the office with his hands in his pockets fondling his genitalia. Everts also testified that Amos began directing his behavior toward her in February 1993 by brushing up against her with his penis erect. Everts stated that at different times Amos brushed his hand over her buttocks, grabbed her waist, and stared at her and stuck out his tongue. Despite the filing of the EEOC charge Amos's misconduct continued, including tapping his fingers on Everts's back, placing his hand on her back as she walked down the hall, and yelling out to her that her legs looked nice.

When Ameritech received notice of Everts's EEOC complaint, it acted according to established company procedures for handling external complaints and referred the matter to

Ameritech's legal department. Ameritech did not investigate the complaint, but rather cooperated with the EEOC investigation. Because Everts had refused to cooperate in Sharp's investigation, Leck believed that the complaint was in response to the company's threat to hold the union liable. An attorney in Ameritech's legal department ultimately concluded that Everts's charge had no merit. Amos was not disciplined as a result of the Everts complaint.

In June 1993, Patricia Wolter, a supervisor in the small business office, found a note on her desk that read: "Patti, you look so sexy today." Wolter was upset by the note, and she asked Amos if he was the author. Amos admitted having written the note, but he claimed that it was just a joke. Wolter reported the incident to Carol Merriwether, who was serving as EEO Coordinator while Sharp was out of the office. As a result of this incident, Ameritech suspended Amos for thirty days.

Wendy Pollard, the third claimant in this case, began working with Amos in the small business office in November 1993. After approximately one month in the office, Amos began touching and grabbing Pollard's hair and shoulders when he passed. Amos also frequently stared at Pollard while she was working, often with his belt unbuckled. One afternoon, after overhearing a conversation about Pollard's new jeans, Amos stood up, stared at Pollard's crotch, and said "Wendy, I think you are right, those jeans are a little too tight." In other incidents, Amos told Pollard that he would try to stop touching her hair but that he was obsessed, and brought in pictures of topless women and women in lingerie to show Pollard and another female co-worker.

The final incident during Amos's tenure at Ameritech occurred on March 7, 1994. While Pollard was moving her belongings, she looked over the partition next to her new desk and saw Amos sitting in a chair masturbating. Pollard reported the incident to Ameritech's EEO Coordinator. Ameritech suspended Amos pending investigation and it terminated his employment later that month.

B.

On February 21, 1995, the EEOC filed a complaint in federal district court against Ameritech. The Commission alleged that Ameritech violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. sec. 2000e et seq., by subjecting Everts and other similarly situated females to sexual harassment. The EEOC sought both compensatory and punitive damages.

Before the trial on the sexual harassment claims against Ameritech began, the district court considered whether to allow Ameritech to present evidence at trial related to its collective bargaining agreement with Amos's union. Ameritech wanted to present evidence that its decision regarding the timing of Amos's discharge was influenced by management's concern that if Amos were discharged in violation of the "just cause" provision of the collective bargaining agreement, Amos would have filed a union grievance, prevailed on that grievance, and been reinstated by an arbitrator.

After hearing argument on the issue, the district court excluded testimony relating to Ameritech's concern that Amos might be reinstated under the "just cause" standard. As the court read the relevant law, Title VII required Ameritech to "act adequately and reasonably to end the harassment." The district court found that Ameritech'scollective bargaining agreement, or its fears that an arbitrator might reinstate Amos, were not relevant in determining the reasonableness of Ameritech's actions under Title VII.

The district court reaffirmed its evidentiary ruling as to the collective bargaining agreement and the arbitration evidence in a written order dated September 15, 1997. In that order, the court stated that "any concerns by an em ployer that an arbitrator might undo the discipline it has meted out for misconduct does not excuse taking no, or very little, action when [Title VII] requires them [sic] to act promptly to halt any violations of its provisions." The court also noted its fear that if an employer was entitled to delay taking action against an employee because of the risk of arbitration, employment

discrimination law would be subject to "the vagaries of collective bargaining and negotiated grievance and arbitration procedures."

During the course of trial, Ameritech moved for judgment as a matter of law as to punitive damages. Ameritech argued that the EEOC had presented no evidence that would support an award of such damages. The district court denied Ameritech's motion, and held that it would instruct the jury on punitive damages. The court's decision with regard to this instruction was based on the understanding that punitive damages are available if "an employer exhibits a consistent attitude of indifference to the protected rights of the claimant in the face of evidence indicating that corrective action that has already been taken has not stopped the harassment." The court further stated that the EEOC would have to establish Ameritech's reckless indifference to the claimants' Title VII rights by clear and convincing evidence.

Near the close of trial, and again at the end of trial, Ameritech renewed its motion for judgment as a matter of law. Ameritech argued that the evidence presented by the EEOC did not establish a hostile working environment or liability on the part of Ameritech, and further contended that the evidence failed to show damages in connection with Everts's claim. The district court denied both of these motions and the case went to the jury.

The jury returned a verdict for the EEOC in the following amounts: $10,000 in compensatory damages and $500,000 in punitive damages on Wentland's claim; $0 in compensatory damages and $50,000 in punitive damages on Everts's claim; and $5,000 in compensatory damages and $500,000 in punitive damages on Pollard's claim. Ameritech immediately moved for judgment notwithstanding the verdict and remittitur and the district court took both of these motions under advisement.

On October 3, 1997, the district court entered judgment in favor of the Commission. The court ordered that damages be paid to the claimants in the following amounts: $10,000 in compensatory damages and $290,000 in

punitive damages to Wentland; $0 in compensatory damages and $0 in punitive damages to Everts; and $5,000 in compensatory damages and $295,000 in punitive damages to Pollard. The court then denied a motion by the Commission to amend the judgment, and denied Ameritech's motions for judgment notwithstanding the verdict, new trial, and remittitur beyond the reduction in damages reflected in the court's order. Ameritech filed a notice of appeal with this Court, and the Commission cross-appealed. The two appeals were consolidated for argument.

On October 27, 1998, the district court issued an order indicating it was inclined to grant the Commission's motion to reconsider the issue of Everts's damages. The case was then remanded to the district court for modification of final judgment. Upon remand, the district court reinstated the jury's verdict awarding $50,000 in punitive damages to Everts. Ameritech now appeals from the district court's amended judgment of December 22, 1998.

II.  Analysis
A.

We review the district court's denial of Ameritech's motions for judgment as a matter of law de novo. See Emmel v. Coca-Cola Bottling Co. of Chicago, 95 F.3d 627, 629 (7th Cir. 1996). Our review is limited to "whether all evidence presented, 'combined with all reasonable inferences that may be drawn from it, is sufficient to support the verdict when viewed in the light most favorable to the party winning the verdict.'" Hennessy v. Penril Datacomm Networks, Inc., 69 F.3d 1344, 1354 (7th Cir. 1995) (quoting Mathewson v. National Automatic Tool Corp., 807 F.2d 87, 90 (7th Cir. 1986)). As to punitive damages, we ask only if "a reasonable jury could have awarded punitive damages against [Ameritech]." Tincher v. Wal-Mart Stores, Inc., 118 F.3d 1125, 1132 (7th Cir. 1997).

Ameritech first contends that the district court erred in denying its motion for judgment as a matter of law as to the issue of punitive damages because the evidence presented at trial did not support a punitive damages award.

Punitive damages "require more than . . . 'intentional unlawful discrimination.'" Tincher, 118 F.3d at 1133 (quoting Emmel, 95 F.3d at 636). The EEOC must also "prove that the defendant employer engaged in the discriminatory practice 'with malice or reckless indifference to the federally protected rights of the employee.'" Emmel, 95 F.3d at 636 (quoting 42 U.S.C. sec. 1981a(b)(1)). A showing of "malice or reckless indifference" under 42 U.S.C. sec. 1981a requires proof "that the defendant almost certainly knew that what he was doing was wrongful and subject to punishment."/3 Soderbeck v. Burnett County, Wis., 752 F.2d 285, 291 (7th Cir. 1985).

   In evaluating Ameritech's insufficiency of the evidence claim as to punitive damages, we must consider the evidence in light of the entire record to determine whether a reasonable jury could have determined that Ameritech acted with "malice or reckless indifference" to the claimants' Title VII rights. See Emmel, 95 F.3d at 636. When examined against the backdrop of Amos's past history, it is apparent that a reasonable jury could have concluded that Ameritech acted with "malice or reckless indifference." In this regard, it is significant that by November 21, 1991, Ameritech had accumulated a history of complaints against Amos going back to 1975. Ameritech had received at least eleven complaints against Amos indicating a pattern and history of misconduct directed at women. These complaints, and Ameritech's disciplinary actions in response, indicate that as of November 21, 1991, Ameritech was on notice of Amos's recurring problems with female co-workers. See Jonasson v. Lutheran Child & Fam. Serv., 115 F.3d 436, 439 (7th Cir. 1997) (stating that although incidents prior to November 21, 1991 cannot serve as a basis for employer liability, they may be used to provide the jury a context for evaluating the reasonableness of the employer's response).

   Despite its knowledge of Amos's misconduct and the futility of its prior disciplinary efforts, Ameritech continued to allow Amos to work in the small business office where ninety percent of the employees were female. Even after the company learned in February 1992 that Amos had sexually harassed Jennifer Rice,

the company issued another warning to Amos and refused his request to be transferred out of the small business office. Furthermore, after Wentland complained to Ameritech about Amos's conduct and a subsequent investigation found that Amos sexually harassed Wentland, Ameritech did not discharge Amos within the thirty-day limit for disciplinary action imposed by the collective bargaining agreement. In addition, Ameritech concluded that Everts's EEOC charge had no merit and thereby failed to act on it, and repeatedly refused to discipline Amos on other occasions. This Court has previously held that the failure of an employer to act to remedy an employee's misconduct, when coupled with the employer's knowledge of that conduct, can be sufficient to justify an award of punitive damages. See Jonasson, 115 F.3d at 438. While the evidence in this case may not compel the conclusion that Ameritech acted with "malice or reckless indifference" to the claimants' Title VII rights, it certainly provides a sufficient basis for a reasonable jury to find in favor of the Commission.

In addition to its claims as to the insufficiency of the evidence on punitive damages, Ameritech also contends that the evidence presented by the EEOC was insufficient to support a conclusion that Ameritech was negligent, or that the claimants suffered a hostile work environment. However, given our conclusion that the record supports an award of punitive damages against Ameritech, we find the company's additional insufficiency of the evidence arguments to lack merit. First, any question as to the sufficiency of the evidence on negligence, and consequently as to Ameritech's liability, see Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1013 (7th Cir. 1997) ("[E]mployers are liable only when they have been negligent either in discovering or remedying the harassment."), is necessarily answered by our discussion of punitive damages. "Malice or reckless indifference" establishes a higher standard than negligence, so evidence supporting the former supports the latter. Similarly, we conclude that the evidence in this case was sufficient to establish the existence of a hostile work environment. All of the claimants experienced various incidents

with Amos involving suggestive comments, inappropriate touching, or indecent exposure. Furthermore, all of the claimants testified that they were disturbed by this conduct. There is no question that the evidence presented by the EEOC was enough to establish a hostile work environment from both an objective and a subjective perspective, see id., and that the evidence presented was sufficient to justify an award of both compensatory and punitive damages./4

B.

With regard to Ameritech's evidentiary challenges, we review the rulings of the district court for an abuse of discretion. See Buckner v. Sam's Club, Inc., 75 F.3d 290, 292 (7th Cir. 1996). "[T]he relevant inquiry is not how the reviewing judges would have ruled if they had been considering the case in the first place, but rather whether any reasonable person could agree with the district court." Geitz v. Lindsey, 893 F.2d 148, 150 (7th Cir. 1990). If we determine that the district court has abused its discretion in making an evidentiary ruling, we nonetheless affirm the district court if the erroneous ruling is determined to be harmless. See Holmes v. Elgin, Joliet & E. Ry. Co., 18 F.3d 1393, 1397 (7th Cir. 1994).

Ameritech challenges the district court's decision to exclude evidence regarding Ameritech's obligations under its collective bargaining agreement and the effect those obligations had on the timing of Amos's dismissal. The district court held that such evidence was "not relevant to a determination of the reasonableness of an employer's response to sexual harassment in the workplace." According to Ameritech, the district court's ruling in this regard was erroneous as a matter of law. The reasonableness of Ameritech's response should be determined according to whether it was "'reasonably calculated to prevent further harassment under the particular facts and circumstances of the case at the time the allegations were made.'" McKenzie v. Illinois Dep't of Trans., 92 F.3d 473, 480 (7th Cir. 1996) (quoting Brooms v. Regal Tube Co., 881 F.2d 412, 421 (7th Cir. 1989)). Ameritech contends

that its obligations under its collective bargaining agreement were part of the facts and circumstances that informed Ameritech's judgment as to Amos's discipline, and as such they are relevant to a jury's determination of the reasonableness of its response.

Ameritech also argues that the exclusion of the arbitration evidence was erroneous in light of the punitive damages instruction given to the jury, and the large punitive damages awards that were returned. As has been previously discussed, in order to receive an award of punitive damages the EEOC must show that Ameritech acted with "malice or reckless indifference" to the claimants' Title VII rights. Emmel, 95 F.3d at 636. According to Ameritech, it acted not out of "malice or reckless indifference," but rather out of concern for its obligations under the collective bargaining agreement and its fear that Amos would be reinstated by an arbitrator if he were fired. By excluding evidence of the collective bargaining agreement and the possibility of reinstatement, the district court precluded Ameritech from presenting what Ameritech contends was important evidence that would go toward proving it did not act with the state of mind necessary for the imposition of punitive damages.

In evaluating the district court's decision excluding evidence of the collective bargaining agreement and the potential outcome of arbitration proceedings, we must first determine what the district court meant when it stated that the evidence in question was irrelevant. As we understand it, the district court was not considering the question as a matter of logical relevance; the district court did not mean that this evidence was not useful in assessing the probability that Ameritech acted with "malice or reckless indifference." Fed.R.Civ.P. 401. Nor did the district court indicate that "the probative value [of the evidence was] substantially outweighed" by other considerations. Fed.R.Civ.P. 403. Rather, the district court stated that "an employer is subjected to separate duties under a positive law, such as Title VII, and under a [collective bargaining agreement]," and when those duties conflict "the positive law controls." In

essence, the district court held that as a matter of law, Ameritech's obligations under the collective bargaining agreement and its fears as to the possible outcome of arbitration could not be introduced in the face of conflicting duties under Title VII.

To the extent the district court's ruling reflects the idea that Title VII always trumps the provisions of a collective bargaining agreement, that ruling is erroneous as a matter of law. While it is true that employers cannot use collective bargaining agreements to contract around anti-discrimination laws like Title VII, see Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 79 (1977) ("[A] collective-bargaining contract . . . may [not] be employed to violate the statute."), that principle is not applicable to this case. The EEOC does not allege that Ameritech negotiated for the thirty-day limit on disciplinary action in order to avoid Title VII obligations, nor is there any evidence in the record to that effect. Furthermore, this is not a situation where Ameritech is seeking to use its obligations under the collective bargaining agreement as an affirmative defense precluding liability under Title VII./5 Rather, Ameritech seeks only to introduce evidence as to its collective bargaining agreement, and its concern over the possible outcome of arbitration, to demonstrate that it did not act with the state of mind necessary for an award of punitive damages and to show that its response to Amos's misconduct was reasonable. See Deneen v. Northwest Airlines, Inc., 132 F.3d 431 (8th Cir. 1998) (holding that proof of discrimination offered by the plaintiff was insufficient to support a punitive damages award in light of the employer's belief that its actions were required by a collective bargaining agreement). In this context, the district court erred in finding that evidence of Ameritech's collective bargaining agreement was irrelevant as a matter of law.

The relationship between an employer's obligations under its collective bargaining agreement and potentially conflicting obligations under an anti-discrimination statute like Title VII is more complex than the district court's decision indicates. Title VII and collective bargaining agreements/6 each

represent important congressional policies: preventing discrimination in the workplace, and "effecting workable and enforceable agreements between management and labor," Trans World Airlines, 432 U.S. at 79. Given the important national policies underlying both Title VII and collective bargaining agreements, it is incorrect to hold, as the district court did, that obligations under Title VII always trump obligations that exist under valid labor agreements. See id. (holding that an agreed-upon seniority system did not "give way" to an employer's duty to "reasonably accommodate" religious observance under Title VII); Eckles v. Consolidated Rail Corp., 94 F.3d 1041, 1051 (7th Cir. 1996) (holding that a collectively-bargained seniority system was not trumped by the duty to "reasonably accommodate" the disabled under the Americans With Disabilities Act). Because the district court based its decision to exclude the disputed evidence on an error of law, that decision constitutes an abuse of discretion./7 See Waid v. Merrill Area Pub. Sch., 130 F.3d 1268, 1273 (7th Cir. 1997).

While the EEOC concedes that the district court may have been mistaken about the legal relationship between collective bargaining agreements and Title VII, it contends that any such mistake was harmless. We disagree. Although the EEOC correctly points out that Ameritech was able to present evidence as to the thirty-day limit on disciplinary action under the collective bargaining agreement, Ameritech employees were prevented from testifying about the facts and circumstances surrounding the timing of their decision to terminate Amos. Ameritech was also precluded from presenting evidence that it failed to discharge Amos after the Wentland incident because of concerns about violating the collective bargaining agreement. Furthermore, Ameritech could not present evidence as to the likelyoutcome of arbitration, and its decisionmakers' fears that Amos would be reinstated were he to be discharged in violation of the collective bargaining agreement. As we have previously noted, this was potentially significant evidence as to Ameritech's state of mind and to the reasonableness of Ameritech's actions, and we cannot say that the

outcome of the trial would have been the same had the jury been permitted to hear this evidence. See United States v. Stefonek, 179 F.3d 1030, 1036 (7th Cir. 1999) ("A 'harmless error' as the term is used in law is a trial error that does not alter the trial's outcome."); Collins v. Kibort, 143 F.3d 331, 339 (7th Cir. 1998) (stating that an error is not harmless when "a significant chance exists" that the error "affected the out come of the trial").

Our conclusion that this evidence was not harmless is bolstered by the nature of the jury verdict in this case. In the case of all three claimants, the punitive damages awards rendered by the jury far surpassed the awards given for compensatory relief. When punitive damages are such an important part of a jury award, the defendant's state of mind is a central issue. See Kolstad v. American Dental Ass'n, 119 S.Ct. 2118, 2125-26 (1999) ("Most often . . . eligibility for punitive awards is characterized in terms of a defendant's motive or intent."); Ortiz v. John O. Butler Co., 94 F.3d 1121, 1127 (7th Cir. 1996) (stating that the "requisite showing for punitive damages necessarily focuses upon the defendant's state of mind"). By precluding the disputed evidence, the district court deprived Ameritech of potentially valuable evidence that would have allowed it to counter the jury's impression that it acted negligently or with "malice or reckless indifference" to the claimants' Title VII rights. The sheer size of the jury's verdict in this case, when viewed in relation to the amount of compensatory damages awarded, supports our conclusion that the district court's erroneous preclusion of the arbitration evidence was not harmless.

III. Conclusion

Because we have determined that the evidence was sufficient to support the jury's verdict, we decline to enter judgment on behalf of Ameritech. However, in light of our ruling that the district court erred in excluding evidence of Ameritech's collective bargaining agreement and its concern about the outcome of arbitration, we REVERSE the judgment of the district court and REMAND this case for further proceedings

consistent with this opinion.

/1   Both parties agree that November 21, 1991 is
the relevant date for purposes of determining
Ameritech's liability for punitive damages be-
cause that is the date on which 42 U.S.C. sec.
1981a was enacted. That statute, which provides
for punitive damages under Title VII, is not
retroactive. See Landgraf v. USI Film Prod., 511
U.S. 244, 281 (1994). Similarly, the district
court correctly determined that compensatory
damages could not be awarded based on emotional
distress for conduct before November 21, 1991.
Recovery of compensatory damages was added by 42
U.S.C. sec. 1981a, and that provision is non-
retroactive as well. Landgraf, 511 U.S. at 281-
83.

/2 Under the terms of the collective bargaining
agreement, Ameritech could have terminated Amos
outside the thirty-day window for disciplinary
action if it had suspended Amos before the thir-
ty-day limit expired.

/3 The district court properly instructed the jury
that in order to hold Ameritech liable for puni-
tive damages, it would have to find that in
dealing with Amos after November 21, 1991 Amerit-
ech: (1) was motivated by malice ("ill will, or
spite, or grudge") toward Wentland, Pollard, and
Everts, or toward female employees as a class; or
(2) acted with both "a high degree of awareness
that its conduct would violate Title VII" and
"consistent disregard for such a violation."

/4 Ameritech also contends that the punitive damages
awards in this case were clearly excessive. In
support of this contention, Ameritech points out
that two of the punitive damages awards, $290,000
to Wentland and $295,000 to Pollard, were near
the statutory maximum of $300,000 established by
42 U.S.C. sec. 1981a (b)(3)(D). According to
Ameritech, Hennessey v. Penril Datacomm Networks,
Inc., 69 F.3d 1344 (7th Cir. 1995), held that
awards at or near the statutory maximum should be
reserved for the most egregious of cases, and
that this is not an appropriate case for such a
large award.

   We believe Ameritech has misread our holding in
Hennessey, which reduced an award at the statuto-
ry maximum. Id. at 1355-56. Although Hennessey
provides support for the idea that punitive
damages awards can be excessive, and that awards
at or near the statutory maximum should be re-
served for egregious cases, the Court in that
case limited the decision to its facts and did
not purport to establish a per se rule about the
availability of punitive damages at or near the

statutory maximum. It is well-recognized that the amount of damages is largely within the province of the jury, and that its determination should not generally be disturbed. See EEOC v. AIC Security Investigations, Ltd., 55 F.3d 1276, 1287 (7th Cir. 1995) ("[T]he primary responsibility for deciding the appropriate amounts of [punitive] damages rests with the jury."). Here, a jury could well have determined that Ameritech's conduct was egregious and warranted a large punitive damages award, and the district court's award of punitive damages at or near the statutory maximum was not in error.

/5 In response to the dissent, we want to emphasize that our opinion should not be read to imply that Ameritech, or any employer, can use a provision in its collective bargaining agreement to shield itself from liability under Title VII. An employer has a clear responsibility under Title VII to act reasonably to end sexual harassment and to protect its employees from harassing behavior, see Brooms v. Regal Tube Co., 881 F.2d 412, 421 (7th Cir. 1989) (recognizing "that an employer is liable for an employee's action if the employer knew or should have known about an employee's acts of harassment and fails to take appropriate remedial action"), and Ameritech's obligations in that regard remain unchanged. However, Ameritech's obligation to end sexual harassment, and consequently its vicarious liability for the actions of non-supervisory employees, is not absolute. See Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 72 (1986) (stating that there are "some limits on the acts of employees for which employers under Title VII are to be held responsible"); Juarez v. Ameritech Mobile Comm., Inc., 957 F.2d 317, 320 (7th Cir. 1992) ("Employers are not strictly liable under Title VII for sexual harassment engaged in by their employees."). Under Title VII, employers are liable for compensatory damages only upon a showing of negligence, see Baskerville v. Culligan Int'l Co., 50 F.3d 428, 432 (7th Cir. 1995) ("[T]he criterion for when an employer is liable for sexual harassment is negligence."), and liability for punitive damages is limited to situations where an employer acts with "malice or reckless indifference," 42 U.S.C. sec. 1981a(b)(1). By focusing on an employer's duty to remedy sexual harassment under Title VII, and not on the issue of Ameritech's state of mind, we respectfully suggest that both the district court and the dissent misapprehend the purpose for which Ameritech sought to introduce the disputed evidence.

In order to counter the plaintiffs' allegation that it acted negligently or with "malice or reckless indifference" when it failed to terminate Amos following the Wentland incident, Ameri-

tech should have been allowed to present evidence as to its asserted justification for acting (or failing to act) in the way that it did. Only after hearing this evidence could the jury properly evaluate Ameritech's state of mind and the reasonableness of its response. Our holding in this regard does not elevate Ameritech's obligations under the collective bargaining agreement, or its fears about the possible outcome of arbitration, into a defense to Title VII liability. Having heard this evidence, a jury could conclude that Ameritech should have discharged Amos after the Wentland incident regardless of whether that action would have violated the collective bargaining agreement. In this case, however, the jury did not have the opportunity to consider Ameritech's asserted justification for its actions because the district court erroneously determined that Ameritech's obligations under its collective bargaining agreement were irrelevant to its responsibilities under Title VII. We reverse and remand this case not, as the dissent characterizes our opinion, because the district court precluded Ameritech from offering evidence of its collective bargaining agreement as a defense to Title VII liability, but rather only because the district court erroneously prevented Ameritech from offering relevant evidence regarding its state of mind and the reasonableness of its response to Amos's harassing acts.

/6 The congressional policies underlying collective bargaining agreements are embodied in the National Labor Relations Act, 29 U.S.C. sec. 151 et seq.

/7 The EEOC concedes that the district court's statement of the law may be incorrect, but argues that this mistake of law did not serve as the basis of the district court's opinion. Rather, the EEOC asserts that the district court engaged in a Rule 403 analysis and concluded on the facts of this case that Ameritech's concern about violating its collective bargaining agreement was so speculative as to render it irrelevant for purposes of determining the appropriate response to Amos's behavior. We do not read the district court's opinion in this manner. The district court indicated numerous times that it regarded the disputed evidence to be inadmissible as a matter of law, and we find no support for recharacterizing the court's decision as a discretionary one.

ROVNER, Circuit Judge, concurring in part and dissenting in part. Nearly two decades after it fired the first woman to complain of Gary Amos' harassment, Ameritech at last did what it should

have done years before--it fired him. By that time, Amos had sexually harassed at least eighteen of Ameritech's female employees, variously touching the women, exposing himself to them, peppering them with suggestive remarks, masturbating in their presence, and rubbing his erect penis against their bodies. Long after it was clear to the company that it had a serial harasser in its employ, Ameritech botched any number of opportunities to deal with his misconduct decisively. It warned and suspended Amos without effect; it promised harsher sanctions in the future but did not follow through; when it finally resolved to fire Amos in 1992, it inexcusably missed the thirty-day deadline imposed by the collective bargaining agreement; and even after that fumble, Ameritech waited for three more women to complain of harassment before it ultimately terminated Amos. The evidence was thus more than sufficient to support the jury's conclusion that Ameritech's response to the harassment was not only negligent, but indicative of a reckless indifference to the rights of the women in its employ, such that punitive damages were appropriate. With that much of the majority opinion, I wholeheartedly concur.

I do not agree, however, that the district judge abused his discretion in excluding evidence of Ameritech's professed concern for the outcome of arbitration that might have ensued had the company fired Amos sooner than it did. The arbitration defense posits a conflict between the obligation that Title VII imposes on an employer to protect its workers from sexual harassment and certain provisions of the collective bargaining agreement between Ameritech and its unionized workforce. More specifically, the defense assumes that an arbitrator interpreting the agreement might not agree with--and might well undo-- disciplinary action that Ameritech has taken in fulfillment of its statutory obligation to address workplace harassment. Proof along that line, Ameritech posits, would have shown the jury why its decision not to discharge Amos in December 1992 and again in June 1993 was reasonable: not wishing to see an arbitrator reinstate Amos, it was simply biding its time until it could fire Amos under circumstances that an arbitrator would agree warranted his discharge. What Ameritech wants, then, is for the jury to evaluate the company's conduct not solely in terms of what was reasonably necessary to stop the harassment that Amos was inflicting on his co-workers, but also in terms of what the collective bargaining agreement and an arbitrator might have permitted.

I believe my colleagues are mistaken in opening

the door to this defense. Title VII imposes an unequivocal duty on employers to take reasonable measures to stop harassment. Never before today have we held that the provisions of a collective bargaining agreement--or, more accurately, concerns about how an arbitrator might interpret them--can modify this obligation. What Ameritech has won is the right to invoke the collective bargaining agreement as an excuse for sitting on its hands while Amos kept on terrorizing his female colleagues. In fact, however, nothing in the collective bargaining agreement forced Ameritech to forego discharging Amos. And to the extent that an employer's duties under Title VII and a collective bargaining agreement may conflict, its obligation to protect its workers from harassers should take precedence, as Judge McKinney held. To permit the jury to let an employer off the hook because of its professed concerns about how an arbitrator might interpret the collective bargaining agreement in effect holds unionized employers to a lesser standard of care in eliminating workplace harassment.

1.

What one must appreciate at the outset is that Ameritech's liability in this case hinges not on its failure to act on any one occasion in particular, but on its pattern of inaction in the face of Amos' unrelenting misconduct. Consider what the company knew when the amended version of Title VII took effect in November of 1991. By that time, Amos had harassed at least thirteen women at Ameritech. His acts already had run the entire gamut of harassment, from inappropriate remarks to intimate and unwelcome touching. Indeed, by my count, Amos had already exposed himself at least five times by then and had rubbed his erect penis against startled co-workers on at least as many occasions. Nothing that Amos did after 1991, then, could have come as a surprise to Ameritech. The company had already disciplined Amos on several occasions and had twice threatened to fire him if he persisted in the harassment. See Tr. 193, 570. It also knew, as of 1991, that the discipline and warnings had proven ineffective; for in investigating the complaints of Debbie Murray and an anonymous co-worker that year, Ameritech learned that Amos was continuing to engage in sexual misconduct. Tr. 584-93, 811-18.

With this history in mind, one would think that Ameritech, if genuinely concerned about the welfare of its female employees, would have taken more aggressive action in response to the acts of harassment that occurred after the Civil Rights Act of 1991 took effect. Instead, the company bungled opportunity after opportunity to take

decisive action against Amos. In early 1992, after Jennifer Rice complained of inappropriate remarks and physical contact, the company simply told Amos that he was not to touch anyone in the office and warned him--again--that further misconduct might result in suspension or termination. Tr. 596-97. It did not fire him, it did not suspend him, it did not dock his pay, it did not, in fact, take any punitive action against him. It even rejected Amos' own suggestion that he be transferred out of the small business office (Tr. 1096-97), where ninety-five percent of his co-workers were women (see Tr. 177, 408, 843). Later that year, Amos touched Debbie Wentland inappropriately--thereby violating his supervisor's admonition not to have physical contact with his co-workers--and rubbed his erect penis through his pants while talking to her. The company's EEO coordinator recommended his discharge for this conduct (Tr. 776-77, 847), but her recommendation sat unread on the labor relations manager's desk until after the thirty-day period for discipline specified by the collective bargaining agreement had already expired (Tr. 644). The company at that point concluded it could take no action against Amos.

Having muffed the decision to fire Amos in 1992, Ameritech should have been fully prepared to take swift and decisive action when the next incident of misconduct occurred. See Tr. 255, 648, 829-30, 1193. Yet, even after Lori Everts filed an E.E.O.C. charge in 1993 because Amos had touched her inappropriately, fondled his genitalia through his clothing in front of her, and brushed up against her while aroused--all things he had done before to other women--the company did not so much as investigate her complaint. See Tr. 930-31, 941, 944-45, 1141. When Amos wrote the "you look so sexy today" note to supervisor Patricia Wolter in June 1993, Ameritech opted simply to suspend him, a measure that had already proven ineffective. See Tr. 406. This freed Amos to harass Wendy Pollard, who began to work with him in November 1993. After months of touching her hair, staring at her with his belt unbuckled, telling her that he was obsessed with her, displaying photos of lingerie-clad and topless women to her, Amos finally drove Pollard to the EEO coordinator when she discovered him sitting at his desk, with his penis exposed and erect, masturbating. Finally, the company got it right--it suspended him immediately pending investigation and ultimately terminated him.

Ameritech thus allowed the equivalent of an armed torpedo to wander about the workplace for years wreaking havoc upon its female employees. At least eighteen women--that we know of--fell

victim to Amos' harassment. To focus upon Ameritech's failure to act in any single instance--as its arbitration defense invites us to do--is to miss the larger picture. By November of 1991, Ameritech knew that it had an employee who was prone to sexually harass his co-workers in extremely offensive ways, and as to whom repeated warnings and disciplinary measures had proven utterly ineffective. Yet, the company continued to respond to Amos' misconduct with the same day-late-and-a-dollar-short measures it had tried before. Therefore, the first and most important point with respect to Ameritech's liability is not that it failed to discharge Amos in response to the Wentland and Wolter complaints in particular, but that it missed those and so many other chances to take action reasonably calculated to stop his harassment--including not only termination, but demotion, transfer, intensive supervision, warnings to his uninitiated co-workers, and any number of other disciplinary and prophylactic measures.

2.

As I noted at the outset, Ameritech's arbitration defense presupposes some degree of tension between the collective bargaining agreement and Title VII. In December of 1992, the asserted conflict arose from the collective bargaining agreement's thirty-day limit on disciplinary action: by the time Ameritech was prepared to fire Amos in response to Wentland's complaint, thirty days had already passed. If it had gone ahead and fired him after that point, Ameritech posits, an arbitrator might well have declared the discharge invalid and reinstated him. The first and most glaring problem with this line of defense is that the purported clash was one wholly of Ameritech's making.

Only Ameritech is to blame for the failure to discharge Amos in a timely fashion. The collective bargaining agreement gave Ameritech thirty days within which to impose discipline on Amos.  Ameritech does not argue that it was unable to make the discharge decision within this period of time. In fact, the only explanation that Ameritech has offered for not meeting the deadline is that its EEO coordinator, Monica Sharp, left on vacation immediately after she made the recommendation to discharge Amos, and labor relations manager Joyce Leck did not review the recommendation until she herself returned from vacation, after the thirty-day deadline for action had expired. So nothing precluded Ameritech from firing Amos; it simply dropped the ball. Standing alone, this is, at the least, a classic instance of neglect. See Universal Reins. Corp. v. Allstate Ins. Co., 16 F.3d 125, 128 (7th

Cir. 1994). Considered in light of Amos' extensive history of harassment, and Ameritech's own professed certainty that an arbitrator would never have permitted a late discharge, missing the deadline amounts to something much worse.

It is thus more than a bit ironic that Ameritech's own unreasonable failure to act within the constraints of the collective bargaining agreement has been transformed into a defense to liability for both compensatory and punitive damages. The thirty-day time limit was not one unilaterally imposed on Ameritech by the union. The company consented to that restraint in negotiations with the union, and presumably it did so with confidence that thirty days was enough time to make discharge and other disciplinary decisions. Having agreed to the time limit, and presumably knowing from past experience that an arbitrator might well declare a discharge made beyond that time frame invalid, Ameritech knew that it had to discharge Amos within thirty days or not at all.

To accept Ameritech's argument on its own terms, then, is to appreciate the gravity of the company's mistake in allowing the deadline to expire. If, as Ameritech posits, the thirty-day time limit on discipline was ironclad, then the only pertinent question insofar as the reasonableness of Ameritech's actions and state of mind is concerned is what Ameritech did during those thirty days. The answer is nothing. It was entirely fair, in that context, for the E.E.O.C. to castigate Ameritech for not discharging Amos when, as the company admits, its own slip-up accounts for the inability to take that step. See Tr. 1301-04, 1356-57. It was also entirely within the district court's discretion to prevent Ameritech from attempting to pin the failure to discharge Amos on the likelihood that an arbitrator would order him reinstated. Only Ameritech is to blame for the situation in which it found itself. Knowing that it had to act within thirty days, the company dallied, allowing the deadline to come and go without doing anything. That the company may have wished to fire Amos, that it might have done so eventually but for its fears about what an arbitrator would say, is beside the point. See Ameritech Br. 17-18, 34. It would be a bit like a reckless driver claiming that he meant to use more care after he has already mowed down a pedestrian--good intentions mean nothing after the fact. Ameritech is no less culpable for allowing the deadline to expire before acting on Sharp's recommendation to discharge Amos than it would be if it never considered discharging him at all.

There is a second, but equally important, flaw

in the arbitration defense insofar as it revolves around the thirty-day limit. Ameritech would have us believe that the jury was kept in the dark as to the reason for the company's decision not to fire Amos in December 1992. Its opening brief, for example, asserts that "Ameritech was prevented from presenting the evidence explaining why it did not terminate Amos at that time-- specifically, because an arbitrator would have reinstated him." Ameritech Br. 34 (emphasis in original); see also Reply Br. 12-13. Yet, as my colleagues acknowledge, Ameritech was able to explain that it did not discharge Amos in response to Debbie Wentland's complaint because it did not effectuate that decision within the thirty-day time frame specified by the collective bargaining agreement. See, e.g., Tr. 1327. In fact, as the record reveals, the thirty-day limit on disciplinary action was discussed again and again (and again) during the trial--on more than twenty occasions, by my count. See Tr. 38-39, 202-03, 212, 219-26, 234-35, 248-55, 259-260, 261, 279, 280, 291, 335-40, 521, 608-09, 627, 642-48, 777, 779, 807, 926, 1103-04, 1145-46, 1301-04, 1327, 1356-57. The jury was thus fully aware of the deadline and the constraints it imposed on Ameritech's ability to deal with Amos. Evidence that an arbitrator would have enforced that deadline might have been apropos had a witness or the E.E.O.C. opined that Ameritech was free to ignore the deadline and fire Amos anyway. Ameritech suggests that this was the case. Ameritech Br. 34; Reply Br. 12-13. My colleagues appear to agree. See ante at 20. They have been misled. A review of the record makes clear that no one--no one--ever suggested that Ameritech could have fired Amos after the thirty-day deadline had expired. On the contrary, the attorneys in their questions and argument, and the witnesses in their testimony, uniformly presumed that the time limit was inviolable./1 As far as the jury knew, then, there was no way around the thirty-day deadline. The notion that there was a compelling need for the arbitration evidence is therefore a fallacy. As the record makes plain, the E.E.O.C. chastised Ameritech not for being unwilling to try and circumvent the deadline after it had already expired, but for failing to meet the deadline in the first instance. See Tr. 1301-04; 1356-57./2

3.

   In June of 1993, another provision in the collective bargaining agreement purportedly stood in the way of discharging Amos. It was then that Amos wrote a note to Patti Wolter telling her "Patti, you look so sexy today." Tr. 387 (emphasis in original). Rather than discharging him, Ameritech opted to impose the most serious form of discipline short of discharge--it

suspended him for thirty days. The collective bargaining agreement permitted discharges only for "just cause," and if permitted Ameritech would have shown that it had lost one or more arbitrations over the just cause issue and that in all probability, had Ameritech fired Amos for writing the note, he would have won reinstatement from an arbitrator.

One can readily appreciate why an arbitrator might not think that the note by itself constituted just cause to discharge Amos. Although troubling to Ms. Wolter--as it indeed might have been to any reasonable person--the note standing alone was relatively innocuous. In view of Amos' lengthy tenure with the company, terminating him simply because he wrote that single note to a co-worker would be a harsh form of discipline. Indeed, a Title VII claim founded on the note alone would surely falter, for without more it would not establish the objectively hostile working environment that the case law requires. E.g., Rennie v. Dalton, 3 F.3d 1100, 1107 (7th Cir. 1993), cert. denied, 510 U.S. 1111, 114 S. Ct. 1054 (1994) ("'isolated and/or trivial remarks of a sexual nature' do not satisfy the definition of sexual harassment"), quoting Downes v. F.A.A., 775 F.2d 288, 293 (Fed. Cir. 1985), abrogated on other grounds by Harris v. Forklift Sys., Inc., 510 U.S. 17, 114 S. Ct. 367 (1993).

It is not at all clear, however, why the note, considered in the full context of Amos' campaign of harassment, would not have constituted just cause for termination. By June of 1993, of course, Amos had a well-documented history of harassing women at Ameritech. What is more, the more severe manifestations of that harassment often were presaged or accompanied by remarks akin to the "you look so sexy" observation Amos made in his note to Wolter. Before Amos pushed his aroused body against Jacquelyn Stine in 1988, for example, he told her that her hair was beautiful, that it was "just really delicious, or . . . sensual," and that he was in love with her. Tr. 73. And just before Amos followed Debbie Wentland around the office in November 1992 as he rubbed the erection in his pants, he patted her stomach and remarked "Oh, so you are going to be a mom." Tr. 271-72. These examples, among many others, demonstrate all too well that statements of the kind Amos made to Wolter were neither isolated nor innocent. Typically, these remarks were part of a pattern of verbal and physical harassment which, left unchecked, simply escalated.

Why an arbitrator would blind himself to this pattern--and to the proven ineffectiveness of

all disciplinary measures short of discharge in stopping Amos' harassment--is left unexplained. Ameritech's prediction of reinstatement seems to assume that the arbitrator would focus solely upon the event precipitating the discharge, without consideration of any of Amos' prior conduct. Cf. Chrysler Motors Corp. v. International Union, Allied Indus. Workers of America, 959 F.2d 685, 686 (7th Cir. 1992) (arbitrator refused to consider other incidents of harassment that employer only discovered after it had already discharged worker), cert. denied, 506 U.S. 908, 113 S. Ct. 304 (1992). Yet, so far as the record reveals, nothing in the collective bargaining agreement so restricts the just cause inquiry. If it did, then we might well have a genuine clash between the collective bargaining agreement and Title VII that Ameritech posits. For Title VII would indeed expect Ameritech to have learned its lessons. When Amos wrote the note to Wolter, Ameritech must have known that he simply was not going to stop harassing his female co-workers, and that terminating him was the only way to bring the harassment to an end. See Tr. 233, 406, 630-31, 701. Indeed, one can read into Ameritech's arbitration defense a concession that it knew as much; by the company's own account, it was simply awaiting the best opportunity to make his discharge "stick." See Ameritech Br. 17-18, 34. But in this record there is no proof that the collective bargaining agreement posed an obstacle to discharging Amos in June of 1993.

4.

   Ameritech's arbitration defense also presupposes that if Ameritech had discharged Amos in either December of 1992 or June of 1993 and an arbitrator had subsequently ordered him reinstated, that order would have been final. That is not the case. Even if an arbitrator had ordered Amos' reinstatement, Ameritech could have contested that decision in court. As the district court recognized, courts can and do refuse to enforce arbitration awards when they conflict with explicit, well-defined public policy. Chrysler Motors, supra, 959 F.2d at 687; see generally United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 43, 108 S. Ct. 364, 373-74 (1987); W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers of America, 461 U.S. 757, 766, 103 S. Ct. 2177, 2183 (1983). The public has a strong interest, which Title VII embodies, in eliminating sex discrimination from the workplace. Chrysler Motors, 959 F.2d at 687. Reinstating an employee who either does not wish or is unable to refrain fromsexually harassing his female co-workers presents an obvious clash with that interest. See, e.g., Stroehmann

Bakeries, Inc. v. Local 776, International Brotherhood of Teamsters, 969 F.2d 1436, 1442 (3d Cir. 1992) (vacating arbitration award reinstating harasser who allegedly assaulted customer's employee: "an award which fully reinstates an employee accused of sexual harassment without a determination that the harassment did not occur violates public policy"), cert. denied, 506 U.S. 1022, 113 S. Ct. 660 (1992); Newsday, Inc. v. Long Island Typographical Union, No. 915, 915 F.2d 840, 845 (2d Cir. 1990) (vacating arbitration award reinstating serial harasser: "[The arbitrator's] award of reinstatement completely disregarded the public policy against sexual harassment in the work place."), cert. denied, 499 U.S. 922, 111 S. Ct. 1314 (1991); Consolidated Edison of New York, Inc. v. Utility Workers' Union of America, No. 95 C 1672, 1996 WL 374143, at *5 (S.D.N.Y. Jul. 3, 1996) (vacating arbitration award reinstating serial harasser: "Reinstatement of an employee who has already been issued a strong and unambiguous warning that any further sexual misconduct could lead to dismissal would contravene public policy condemning such behavior."). Ameritech thus had a firm basis on which to resist Amos' reinstatement. Of course, we cannot know for certain how Ameritech would have fared in the effort to overturn an adverse decision by the arbitrator. But that is the point: having forsaken the opportunity to make its case to an arbitrator and, if necessary, to a court, Ameritech has left us all to speculate about what might have happened.

Moreover, it is not at all clear to me how Ameritech's other employees would have been worse off had the company risked arbitration by discharging him in either December of 1992 or June of 1993. As Judge McKinney wrote, "Overlooked in this argument is the continuing adverse effect Amos's conduct may have on the female employees while the employer waits until it thinks it may have enough evidence to overcome an arbitration decision." R. 213 at 10. For whatever length of time it would have taken for the anticipated arbitration and litigation over the discharge to be resolved, Amos would have been removed from the workplace, granting his female co-workers at least a temporary reprieve from his harassment. In the event of his reinstatement, Ameritech would have been just as capable of terminating him in the future if and when he resumed harassment as it was when the company decided in December 1992 and again in June 1993 to "wait and see" rather than discharging him on those occasions. See Chrysler Motors Corp. v. International Union, Allied Indus. Workers of America, 2 F.3d 760 (7th Cir. 1993) (sustaining the immediate discharge of

reinstated employee based on additional evidence of harassment). Only Ameritech, it seems to me, had anything to gain by following the latter course, sparing itself the possible expense and bother of having to defend a discharge in arbitration and/or litigation.

5.

Even assuming that there was an outright, irreconcilable conflict between the collective bargaining agreement and Title VII, I am not convinced that Ameritech's obligation to protect its employees from harassment necessarily had to yield to the constraints imposed by its contract with the union. The district court may have overstated matters when it said that the provisions of a collective bargaining agreement must invariably give way to an employer's obligations under the civil rights statutes (R. 213 at 9), for Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 97 S. Ct. 2264 (1977), and Eckles v. Consolidated Rail Corp., 94 F.3d 1041, 1051 (7th Cir. 1996), cert. denied, 520 U.S. 1146, 117 S. Ct. 1318 (1997), reveal that this is not always the case. But neither of those precedents, on the other hand, gives an employer license to sit back while its workers are sexually harassed, simply because it believes that a provision of the collective bargaining agreement stands in the way of effective action.

TWA holds simply that Title VII does not require an employer to interfere with the seniority rights of some employees in order to accommodate the religious needs of others. The plaintiff in that case worked for an airline in a critical department that operated twenty-four hours a day, seven days a week. After becoming involved in a religion that proscribed work on Saturdays and on certain religious holidays, the plaintiff asked that his work schedule be adjusted accordingly to give him those days off. Although the company had no difficulty finding volunteers to fill in for the plaintiff on the religious holidays that he observed, no one was willing to work in his stead on Saturdays. Consequently, the only means of accommodating the plaintiff's religious needs would have been to deprive more senior employees of their shift preferences by requiring one or more of those employees to take the Saturday shifts. The airline refused to take that step, and the Supreme Court concluded Title VII did not compel it to do so:

We agree that neither a collective-bargaining contract nor a seniority system may be employed to violate the statute, but we do not believe that the duty to accommodate requires TWA to take

steps inconsistent with the otherwise valid agreement. Collective bargaining, aimed at effecting workable and enforceable agreements between management and labor, lies at the core of our national labor policy, and seniority provisions are universally included in these contracts. Without a clear and express indication from Congress, we cannot agree with Hardison and the E.E.O.C. that an agreed-upon seniority system must give way when necessary to accommodate religious observances.

432 U.S. at 79, 97 S. Ct. at 2274 (footnote omitted). The rights of other employees, as well as the unique importance of seniority provisions in collective bargaining, figured prominently in the Supreme Court's analysis. "It would be anomalous," the Court explained, "to conclude that by 'reasonable accommodation' Congress meant that an employer must deny the shift and job preference of some employees, as well as deprive them of their contractual rights, in order to accommodate or prefer the religious needs of others. . . ." Id. at 81, 97 S. Ct. at 2275; see also id. at 85, 97 S. Ct. at 2277. The Court went on to note that the statute itself singles out seniority rights for special treatment, "mak[ing] clear that the routine application of a bona fide seniority system would not be unlawful under Title VII." Id. at 82, 97 S. Ct. at 2275, quoting International Brotherhood of Teamsters v. United States, 431 U.S. 324, 352, 97 S. Ct. 1843, 1863 (1977).

Our own opinion in Eckles sounds the same theme. The issue there was whether the Americans with Disabilities Act required an employer to guarantee an employee a position compatible with his medical restrictions even if it meant "bumping" a more senior employee from the position in the first instance and preventing other employees with greater seniority from in turn "bumping" the plaintiff from that position later on. Accommodating him in this way "pose[d] a conflict not so much between the rights of the disabled individual and his employer and union," we observed, "but between the rights of the disabled individual and those of his co-workers." 94 F.3d at 1046. Relying on TWA and a host of other cases decided under both the Rehabilitation Act as well as the ADA, we concluded that the duty to reasonably accommodate the limitations of a disabled employee did not compel the employer to ignore the seniority rights of other workers. Id. at 1051. We were quite careful to emphasize the narrow reach of our opinion, however.

We emphasize that our conclusion is limited to individual seniority rights and should not be interpreted as a general finding that all

provisions found in collective bargaining agreements are immune from limitation by the ADA duty to reasonably accommodate. The ADA does not lack force in the unionized workplace, and the duty to provide for the special needs of disabled workers cannot be voided by either skillful manipulation (such as a pretextual seniority system) or inadvertence. We recognize that many of the "reasonable accommodations" specifically proposed within the ADA also have effects on other workers, but find that collectively bargained seniority rights have a pre-existing special status in the law and that Congress to date has shown no intent to alter this status by the duties created under the ADA.

Id. at 1051-52; see also id. at 1046 n.9 ("We most certainly do not here decide that all provisions of collective bargaining agreements will preempt a covered entity's duty to reasonably accommodate a disabled employee under the ADA. We address only collectively-bargained seniority systems that establish rights in other employees.").

My colleagues have taken a significant leap beyond the holdings and rationale of both TWA and Eckles in concluding that an employer may invoke the provisions of a collective bargaining agreement, and its concerns about how an arbitrator might enforce those provisions, as an excuse for the failure to remove a recalcitrant harasser from the workplace. Neither TWA nor Eckles remotely speaks to this issue, and fundamental differences between those cases and the one before us suggest that we should not be so quick to rely on them now. This case does not present the clash between the rights of the plaintiff and the rights of his co-workers that confronted the courts in those two cases. Indeed, seniority rights, which occupy a position of central importance in the collective bargaining process that was cited repeatedly in both TWA and Eckles, are not implicated here at all. Instead, we are dealing with two entirely different provisions of a collective bargaining agreement, neither one of which, as I have explained above, necessarily conflicts with the employer's duty to deal with harassment proactively. To the extent that either of these provisions imposes a constraint that might prevent an employer from taking action that Title VII would otherwise require--as Ameritech's arbitration defense supposes--we should hesitate to allow these provisions to trump an employer's obligations under Title VII.

The thirty-day limit on discharging or otherwise disciplining an employee is simply that, a

limitation on the timing rather than the substance of the action that an employer may take against an employee. I do not doubt that, as a general matter, the employees and their union have a legitimate interest in seeing that deadline enforced; and certainly Amos, as the one facing termination, had a keen interest in the enforcement of that limit. But as a procedural limitation, the thirty-day limit surely ranks much lower in the hierarchy of importance among collective bargaining terms than seniority provisions, which were central to the rationale of TWA and Eckles. Recall too that the thirty-day limit is not absolute--Ameritech could have taken as much time as it wished to make the discharge decision if only it had suspended Amos immediately at the outset of its investigation. See ante at 6 n.2. So as between the collective bargaining agreement's directive that discipline be meted out within thirty days, and Title VII's command that employees be protected from sexual harassment, I have little doubt that the latter should prevail, as Judge McKinney reasoned.

The just cause provision of the collective bargaining agreement is, of course, more substantive. For that reason, it may occupy a position of more central importance to the collective bargaining process. That does not mean, however, that such a provision--or an arbitrator's interpretation of it--will or should prevail over the employer's Title VII duty to address workplace harassment. On the contrary, the case law already makes clear that the public interest in eradicating sexual harassment will in some instances take priority over an arbitrator's assessment of just cause. For example, in Chrysler Motors Corp. v. International Union, supra, 959 F.2d 685, Chrysler asked the court to set aside an arbitrator's order reinstating an employee discharged for sexual harassment. We acknowledged the public policy against workplace harassment reflected in both Title VII and the E.E.O.C.'s sexual harassment guidelines. Id. at 687-88. We also agreed that it would be appropriate for the court to set aside an arbitration award that clashed with this policy. "As with any contract, a court may not enforce an arbitrator's interpretation of a collective bargaining agreement that is contrary to public policy." Id. at 687. As it turned out, we were not convinced that the particular order under review in Chrysler did run afoul of public policy. The evidence before the arbitrator indicated that the harasser had only engaged in a single instance of misconduct and that he was never warned or otherwise disciplined prior to his discharge; the record also gave the arbitrator no cause to believe that he was incapable of rehabilitation. 959 F.2d at 688-89.

Under those circumstances, we believed that the arbitrator's order reinstating him was consistent both with the just cause provision of the collective bargaining agreement and with public policy. Id. at 689. What is implicit throughout our opinion, however, is that we would not hesitate to set aside an arbitrator's order if, for example, it required the reinstatement of a recidivist harasser, a move that would jeopardize the rights of his co-workers and undermine the public interest in a harassment-free workplace. Our sister circuits have done just that. E.g., Newsday, Inc. v. Long Island Typographical Union, supra, 915 F.2d at 845; see also Stroehmann Bakeries, Inc. v. Local 776, International Brotherhood of Teamsters, supra, 969 F.2d at 1442.

The rights of Amos' co-workers cannot be over-emphasized in this analysis, particularly in view of the rationale of TWA and Eckles. In each of those cases, the rights of other employees would have suffered had the plaintiff been given the accommodation he sought. Here the opposite is true. The women who worked around Amos had an undeniable interest in seeing Amos discharged as promptly as possible once it was clear that milder forms of discipline were ineffective in stopping his abhorrent behavior. On the other hand, allowing Amos to remain in the workplace until Ameritech believed it had a sure-fire case of just cause to fire him had the predictable consequence of subjecting more women to a hostile work environment.

These distinctions vanish today, however, as my colleagues articulate no limits on what types of collective bargaining agreement provisions trump an employer's obligation to remediate discrimination. This is a troubling result, for both this and future cases. Never mind that Ameritech alone is responsible for the failure to comply with the contractual deadline in December 1992; and never mind that no arbitrator or court was ever invited to decide whether discharging Amos either then or in June of 1993 would have been appropriate notwithstanding the thirty-day and just cause provisions of the collective bargaining agreement. Having waited for years (and years) to get rid of Amos, Ameritech may now hold up the collective bargaining agreement as a fig leaf for its own inaction. I have no doubt that other unionized employers will follow suit.

6.

Even if the district court did err in excluding evidence as to the collective bargaining agreement and Ameritech's fears of unfavorable arbitration, that error does not require us to

overturn the jury's verdict and put these parties to the expense of a new trial. Two quick points deserve making in that regard.

Overwhelming evidence supports the jury's finding that Ameritech's response to the harassment was negligent, and that the company was therefore liable for compensatory damages under Title VII. Indeed, the evidence here comes about as close as I have seen to a case for liability as a matter of law. At the outset of the relevant time period in November 1991, Ameritech knew that it had a dangerous employee on its hands. Amos had already harassed thirteen women by then and showed no signs of stopping. On the contrary, he went right on verbally harassing, touching, and rubbing his penis against his female co-workers. Yet, as I indicated above, Ameritech's reaction continued to be half-hearted, bumbling, and wholly ineffective. The failure to effectuate Amos' discharge in December 1992 within the time frame specified by the collective bargaining agreement is but another example of the company's negligence. At the very least, the underlying verdict on liability should stand. To suggest that any reasonable jury would find Ameritech's conduct non-negligent is, I must respectfully submit, preposterous.

The question of punitive damages might at first seem closer in view of the more culpable state of mind required for such damages. But one must bear in mind that Ameritech enjoyed the benefit of a jury instruction that toughened the E.E.O.C.'s burden of proof on punitive damages beyond what the law actually requires. Over the E.E.O.C.'s objection, the district court instructed the jury that the Commission must prove Ameritech's reckless indifference by clear and convincing evidence. Tr. 1114-15, 1378. Yet, a mere preponderance of the evidence is all that is necessary to support an award of punitive damages under 42 U.S.C. sec. 1981a(b)(1). Knowlton v. Teltrust Phones, Inc., 189 F.3d 1177, 1186 (10th Cir. 1999); Stender v. Lucky Stores, Inc., 803 F. Supp. 259, 324 (N.D. Cal. 1992); see generally Price Waterhouse v. Hopkins, 490 U.S. 228, 253, 109 S. Ct. 1775, 1792 (1989). The fact that the jury found the E.E.O.C.'s evidence compelling enough to meet even this heightened burden demonstrates just how strong the Commission's case was.

In the series of Ameritech's ineffective responses to Amos' harassment, one has no difficulty detecting a reckless indifference to the plight of the company's female workers. More than once the company responded to a complaint about Amos as if it were the first, failing to

check his employment history, failing to ratchet up the discipline from that which had already been imposed previously, and, in December of 1992, failing to ensure that the time period in which disciplinary measures could be imposed would not be permitted to expire. Considering what the company knew as of November of 1991, it should have been on high alert from that point forward, prepared to deal with any and all complaints about Amos expeditiously and efficaciously. After it dropped the ball in December 1992, it should have been all the more at the ready to protect its other employees. Even so, three more complaints were required before Ameritech finally terminated Amos. The fact that it took the company nearly twenty years to bring the harassment to an end is telling in and of itself.

Twenty years!

I respectfully dissent.

1/ See, e.g., Tr. 627 ("Q. And meeting that 30 day time frame is essential, correct? A. Absolutely essential."); 645-46 ("Q. Let me ask you this: Has there ever been an occasion, to your knowledge, where somebody had been terminated outside of the 30 day calendar day period prescribed by the contract? A. Not to my knowledge. . . . Q. Could you have suspended Mr. Amos pending investigation and disciplined him under the contract at that time? A. No. Q. Why not? A. Because the 30 day clock had come and gone."); 779 ("Q. What did you hear from Joyce Leck? No action could be taken because of [the] 30 day time line? A. Right, exactly."); 807 ("Q. Isn't it a fact that any discipline cannot be done outside of 30 days? A. I now know that, but I may have not known that before. . . ."); 1145-46 ("Q. Is there a rule in the collective bargaining agreement that says that the company cannot take any disciplinary action after 30 days from the incident? A. Yes. Q. Has the union ever consented to the waiver of that 30 day rule? A. Not that I'm aware of. . . . Q. And if the company missed that time line is it the union's position that the company is absolutely forbidden from taking any type of discipline? A. Right.").

/2 Ameritech argues that Debbie Wentland's testimony triggered the need for the arbitration evidence. Wentland testified that upon hearing the news that Ameritech would not discipline Amos because of the missed deadline, "I was very upset. I was hurt. It is just, I guess I was naive, because I felt like I had worked with the company for 14 years, and again they had no respect for me, they

didn't care about my feelings. They were more concerned about Gary's rights than mine." Tr. 280. Nowhere in Wentland's expression of frustration, however, is there a suggestion that the company could have disregarded the contractual deadline. The direct testimony on that point is entirely to the contrary. See n.1, supra. Indeed, when read in context, Wentland's criticism was directed to the half-hearted and ineffective manner in which the company handled her complaint as well as those of the other women that Amos harassed. See Tr. 275-82, 284, 329-40.

Ameritech also points out that manager Darlene Olberding testified that she would have recommended the dismissal of Amos for Wentland's complaint (Tr. 174) and again suggests that the exclusion of the arbitration evidence left the company unable to explain why Amos was not discharged. Ameritech Br. 34; Reply Br. 10. But Olberding herself acknowledged that the administrative "slip-up" precluded action against Amos (Tr. 174); and she never suggested that the company had the power to ignore the collective bargaining agreement. The fact that she thought termination was the appropriate response was hardly remarkable in and of itself. After all, EEO coordinator Monica Sharp recommended that Amos be discharged (Tr. 776-77, 847).  And Robert McFeely, the director of human resources for the five-state region served by Ameritech, himself testified that Amos would have been terminated but for the fact that the company missed the thirty-day deadline. Tr. 226.